LEASE AND SECURITY AGREEMENT

between

Fayetteville Health Associates Limited Partnership,
a Delaware limited partnership

"Landlord"

and

Northwest Arkansas Rehabilitation Associates
an Arkansas general partnership

"Tenant"

March 28, 1990

CERTAIN DISPUTES UNDER THIS AGREEMENT ARE
SUBJECT TO ARBITRATION


EXHIBIT

## TABLE OF CONTENTS

I       DEFINITIONS . . . . . . . . . . . . . . . . . . . . . .   1

II      LEASE OF PROPERTY . . . . . . . . . . . . . . . . . .   12
        2.1   Property . . . . . . . . . . . . . . . . . . . .   12
        2.2   Construction . . . . . . . . . . . . . . . . . .   13

III     TERM OF LEASE . . . . . . . . . . . . . . . . . . . .   13
        3.1   Term of Lease . . . . . . . . . . . . . . . . .   13
        3.2   Option to Extend Term of Lease . . . . . . . .   14

IV      RENT . . . . . . . . . . . . . . . . . . . . . . . . .   14
        4.1   Payment of Initial Rent . . . . . . . . . . . .   14
        4.2   Payment of Base Rent, Percentage Rent,
              Additional Rent and Additional Charges . . . . .   14
        4.3   Base Rent . . . . . . . . . . . . . . . . . . .   15
        4.4   Percentage Rent . . . . . . . . . . . . . . . .   15
        4.5   Additional Rent . . . . . . . . . . . . . . . .   15
        4.6   Confirmation of Percentage Rent . . . . . . . .   15
        4.7   Certificates Regarding Percentage Rent . . . . .   16
        4.8   Additional Charges . . . . . . . . . . . . . . .   17
        4.9   Net Lease . . . . . . . . . . . . . . . . . . .   17

V       IMPOSITIONS . . . . . . . . . . . . . . . . . . . . .   18
        5.1   Payment of Impositions . . . . . . . . . . . . .   18
        5.2   Notice of Impositions . . . . . . . . . . . . .   19
        5.3   Adjustment of Impositions . . . . . . . . . . .   20
        5.4   Utility Charges . . . . . . . . . . . . . . . .   20
        5.5   Insurance Premiums . . . . . . . . . . . . . . .   20

VI      TERMINATION OR ABATEMENT OF LEASE . . . . . . . . . .   20
        6.1   No Termination or Abatement . . . . . . . . . .   20
        6.2   Abatement Procedures . . . . . . . . . . . . . .   21

VII     OWNERSHIP OF PROPERTY; TENANT'S PERSONAL
        PROPERTY SECURITY INTEREST . . . . . . . . . . . . . .   21
        7.1   Ownership of the Property . . . . . . . . . . .   21
        7.2   Tenant's Personal Property; Security
              Interest . . . . . . . . . . . . . . . . . . . .   21

VIII    CONDITION AND USE OF PROPERTY . . . . . . . . . . . .   23
        8.1   Condition of the Property . . . . . . . . . . .   23
        8.2   Use of the Property . . . . . . . . . . . . . .   24
        8.3   Landlord to Grant Easements . . . . . . . . . .   25

-i-

**Article/Section**                                                            **Page**

IX    LEGAL REQUIREMENTS AND INSURANCE REQUIREMENTS  . . . .    25
      9.1   Compliance with Legal Requirements, Insurance
            Requirements and Instruments . . . . . . . . . .    25
      9.2   Covenants Regarding Legal Requirements . . . . .    25

X     CONDITION OF THE PROPERTY  . . . . . . . . . . . . .      26
      10.1  Maintenance and Repair . . . . . . . . . . . . .    26
      10.2  Encroachments and Restrictions . . . . . . . . .    28

XI    CAPITAL ADDITIONS  . . . . . . . . . . . . . . . . .      29
      11.1  Construction of Capital Additions  . . . . . . .    29
      11.2  Capital Additions Financed or Paid for by
            Landlord . . . . . . . . . . . . . . . . . . . .    30
      11.3  Capital Additions Paid for by Tenant . . . . . .    32
      11.4  Disposition of Capital Additions upon
            Expiration or Termination of Lease . . . . . . .    32
      11.5  Non-Capital Additions . . . . . . . . . . . . .     32
      11.6  Salvage  . . . . . . . . . . . . . . . . . . . .    32

XII   LIENS  . . . . . . . . . . . . . . . . . . . . . . .      32

XIII  CONTESTS . . . . . . . . . . . . . . . . . . . . . .      33

XIV   INSURANCE  . . . . . . . . . . . . . . . . . . . . .      34
      14.1  General Insurance Requirements . . . . . . . . .    34
      14.2  Replacement Cost . . . . . . . . . . . . . . . .    36
      14.3  Additional Insurance . . . . . . . . . . . . . .    36
      14.4  Waiver of Subrogation  . . . . . . . . . . . . .    36
      14.5  Form of Insurance  . . . . . . . . . . . . . . .    36
      14.6  Change in Limits . . . . . . . . . . . . . . . .    37
      14.7  Blanket Policy . . . . . . . . . . . . . . . . .    37
      14.8  No Separate Insurance  . . . . . . . . . . . . .    37

XV    INSURANCE PROCEEDS . . . . . . . . . . . . . . . . .      38
      15.1  Handling of Insurance Proceeds . . . . . . . . .    38
      15.2  Reconstruction in the Event of Damage or
            Destruction Covered by Insurance . . . . . . . .    38
      15.3  Reconstruction in the Event of Damage or
            Destruction Not Covered by Insurance . . . . . .    40
      15.4  Payment of Proceeds on Tenant's Property and
            Capital Additions Paid by Tenant . . . . . . . .    41
      15.5  Restoration of Tenant's Property . . . . . . . .    41
      15.6  Abatement of Rent  . . . . . . . . . . . . . . .    41
      15.7  Damage Near End of Term  . . . . . . . . . . . .    41
      15.8  Termination of Option to Purchase  . . . . . . .    42
      15.9  Waiver . . . . . . . . . . . . . . . . . . . . .    42

**Article/Section**                                                    **Page**

XVI    CONDEMNATION . . . . . . . . . . . . . . . . . . . . . 42
       16.1  Definitions . . . . . . . . . . . . . . . . . . 42
       16.2  Parties' Rights and Obligations . . . . . . . 42
       16.3  Total Taking . . . . . . . . . . . . . . . . . 43
       16.4  Allocation of Portion of Award . . . . . . . . 43
       16.5  Partial Taking . . . . . . . . . . . . . . . . 43
       16.6  Temporary Taking . . . . . . . . . . . . . . . 44

XVII   DEFAULTS AND REMEDIES . . . . . . . . . . . . . . . . 45
       17.1  Events of Default . . . . . . . . . . . . . . 45
       17.2  Certain Remedies . . . . . . . . . . . . . . . 47
       17.3  Damages . . . . . . . . . . . . . . . . . . . 47
       17.4  Application of Funds . . . . . . . . . . . . . 49
       17.5  Failure to Conduct Business . . . . . . . . . 49
       17.6  Landlord's Right to Cure Tenant's Default . . 49
       17.7  Waiver . . . . . . . . . . . . . . . . . . . . 49

XVIII  CURE BY TENANT OF LANDLORD DEFAULTS . . . . . . . . . 50

XIX    PURCHASE OF PROPERTY BY TENANT . . . . . . . . . . . 50
       19.1  Unsolicited Offers . . . . . . . . . . . . . . 50
       19.2  Landlord's Right to Sell . . . . . . . . . . . 51
       19.3  Purchase of the Property . . . . . . . . . . . 51
       19.4  Failure to Close Purchase . . . . . . . . . . 52

XX     HOLDING OVER . . . . . . . . . . . . . . . . . . . . 52

XXI    RISK OF LOSS . . . . . . . . . . . . . . . . . . . . 52

XXII   LIABILITY OF PARTIES . . . . . . . . . . . . . . . . 53
       22.1  Indemnification by Tenant . . . . . . . . . . 53
       22.2  Indemnification by Landlord . . . . . . . . . 54
       22.3  Continuing Liability . . . . . . . . . . . . . 54

XXIII  ASSIGNMENT AND SUBLETTING . . . . . . . . . . . . . . 54
       23.1  Assignment and Subletting . . . . . . . . . . 54
       23.2  Attornment . . . . . . . . . . . . . . . . . . 55
       23.3  Sublease Limitation . . . . . . . . . . . . . 56

XXIV   INFORMATION FROM TENANT . . . . . . . . . . . . . . . 56
       24.1  Officer's Certificates . . . . . . . . . . . . 56
       24.2  Financial Information . . . . . . . . . . . . 56
       24.3  Licensing Information . . . . . . . . . . . . 57

XXV    APPRAISALS OF THE PROPERTY AND OPTIONS . . . . . . . 57
       25.1  Appraisers . . . . . . . . . . . . . . . . . . 57
       25.2  Method of Appraisal . . . . . . . . . . . . . 57

-iii-

**Page**

**Article/Section**

25.3  Landlord's Option to Purchase Tenant's
      Personal Property . . . . . . . . . . . . . .   58
25.4  Tenant's Option to Purchase the Property . . . .   58

XXVI   FACILITY MORTGAGES . . . . . . . . . . . . . . . .   59

XXVII  LIMITATION OF LIABILITY . . . . . . . . . . . . .   60

XXVIII MISCELLANEOUS . . . . . . . . . . . . . . . . . . .   60
       28.1  Landlord's Right to Inspect . . . . . . . . .   60
       28.2  No Waiver . . . . . . . . . . . . . . . . . .   60
       28.3  Remedies Cumulative . . . . . . . . . . . . .   61
       28.4  Acceptance of Surrender . . . . . . . . . . .   61
       28.5  No Merger of Title . . . . . . . . . . . . . .   61
       28.6  Conveyance by Landlord . . . . . . . . . . . .   61
       28.7  Quiet Enjoyment . . . . . . . . . . . . . . .   61
       28.8  Notices . . . . . . . . . . . . . . . . . . .   62
       28.9  Survival of Terms; Applicable Law . . . . . .   63
       28.10 Exculpation of Landlord's Officers and
             Agents . . . . . . . . . . . . . . . . . . . .   63
       28.11 Transfers Following Termination . . . . . . .   63
       28.12 Tenant's Waivers . . . . . . . . . . . . . . .   64
       28.13 Memorandum of Lease . . . . . . . . . . . . .   64
       28.14 Arbitration . . . . . . . . . . . . . . . . .   64
       28.15 Modifications . . . . . . . . . . . . . . . .   64
       28.16 Attorneys' Fees . . . . . . . . . . . . . . .   64

LEASE AND SECURITY AGREEMENT

THIS LEASE AND SECURITY AGREEMENT ("Lease") is executed as of March 28, 1990, by and between FAYETTEVILLE HEALTH ASSOCIATES LIMITED PARTNERSHIP, a Delaware limited partnership, having its principal office at 11150 Santa Monica Boulevard, Los Angeles, California 90025, as Landlord, and NORTHWEST ARKANSAS REHABILITATION ASSOCIATES, an Arkansas general partnership, having its principal office at 600 Wilson Lane, Mechanicsburg, PA 17055, as Tenant, with respect to the following Recitals:

R E C I T A L S

A.     Landlord owns certain real property located in Fayetteville, Arkansas, which is referred to as the "Land" (as defined in Article I).

B.     Landlord shall cause to be constructed on the Land the "Improvements" (as defined in Section 2.1(b)).

C.     Landlord has agreed to lease to Tenant, and Tenant has agreed to hire from Landlord, the Land and the Improvements which collectively constitute the "Property" (as defined in Article I), all upon the terms and subject to the conditions set forth in this Agreement.

D.     Tenant intends to use and operate the Property as a licensed 60-bed comprehensive medical rehabilitation hospital.

NOW, THEREFORE, in consideration of the foregoing Recitals, the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

ARTICLE I
DEFINITIONS

For all purposes of this Lease, unless otherwise expressly provided in this Agreement or the context in which such term is used indicates a contrary intent, (a) the terms defined in this Article shall have the meanings ascribed to them in this Article, (b) all accounting terms not otherwise defined in this Article shall have the meanings ascribed to them in accordance with generally accepted accrual method accounting principles at the time applicable, (c) all references in this Lease to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of this Lease and (d) the words "herein," "hereof" and "hereunder" and

other words of similar import refer to this Lease as a whole and
not to any particular Article, Section or other subdivision:

"Additional Charges" shall have the meaning ascribed to such
term in Section 4.8.

"Additional Rent" shall have the meaning ascribed to such
term in Section 4.5.

"Administrative Rent" shall mean a monthly payment of $1,000
per month to be paid as set forth in Section 4.3.

"Affiliate" of any person or entity (the "Subject") shall
mean (a) any person which, directly or indirectly, controls or is
controlled by or is under common control with the Subject, (b)
any person owning, beneficially, directly or indirectly, five
percent or more of the outstanding capital stock, shares or
equity interests of the Subject or (c) any officer, director,
employee, general partner or trustee of the Subject or any person
controlling, controlled by or under common control with the
Subject (excluding trustees and persons serving in similar capa-
cities who are not otherwise an Affiliate of the Subject). As
used in this definition, the term "person" means and includes
governmental agencies and authorities, political subdivisions,
individuals, corporations, general partnerships, limited partner-
ships, stock companies or associations, joint ventures, associa-
tions, trusts, banks, trust companies, land trusts, business
trusts and any other entity of any form whatsoever, and "control"
(including the correlative meanings of the terms "controlled by"
and "under common control with"), as used with respect to any
person, shall mean the possession, directly or indirectly, of the
power to direct or cause the direction of the management or poli-
cies of such person, through the ownership of voting securities,
partnership interests or other equity interests, or through any
other means.

"Award" shall have the meaning ascribed to such term in
Section 16.1(c).

"Base Period Gross Revenues" shall mean 85% of the Base
Gross Revenues.

"Base Gross Revenues" shall mean Gross Revenues for the Base
Year.

"Base Rate" shall mean the rate of interest announced
publicly by First National Bank of Boston, a national banking
association, in Boston, Massachusetts, from time to time, as said
bank's base rate on corporate loans.

"Base Rent" shall mean an annual amount, determined as of the day before the Commencement Date, calculated by multiplying (x) the Initial Improvements Costs by (y) a rate equal to 320 basis points in excess of the Ten-Year Treasury Rate.

"Base Year" shall mean the period of 12 consecutive months beginning on the first anniversary of the Commencement Date.

"Business Day" shall mean any day on which banking institutions in Boston, Massachusetts, New York, New York and Los Angeles, California are open for the conduct of normal banking business.

"Capital Additions" shall mean (a) one or more new buildings, one or more additional structures annexed to any portion of any of the Improvements, (c) the material expansion of existing Improvements, (d) the construction of a new wing or new story on existing Improvements, (e) the renovation of existing Improvements on the Property in order to provide a functionally new facility providing services not previously offered by Tenant in the Facility or (f) any expansion, construction, renovation or conversion of existing Improvements to (i) increase the bed or service capacity of the Facility or (ii) change the purpose for which the Facility is utilized. Notwithstanding anything to the contrary contained in Article XI, in the event it is necessary to abate or otherwise take corrective action with respect to the existence of a Hazardous Substance (as hereinafter defined) located in, on or under the Property or in the Improvements, such abatement or corrective action shall not be deemed to be a Capital Addition and shall be the sole responsibility of Tenant at its sole cost and expense.

"Capital Additions Cost" shall mean the cost of any Capital Additions made by Tenant, whether paid for by Tenant or Landlord. Such cost shall include (a) the costs of constructing the Capital Additions, including site preparation and improvement, materials, labor, supervision, developer and administrative fees, the costs of design, engineering and architectural services, the costs of fixtures, the costs of construction financing (including but not limited to capitalized interest) and other similar costs approved in writing by Landlord, (b) if agreed to by Landlord in writing in advance, the purchase price and other acquisition costs, or applicable ground lease rental payable for any period such ground lease is in effect to and including the date upon which such Capital Addition is completed and occupied or in operation, as the case may be, of any land which is acquired or leased for the purpose of placing thereon all or any portion of the Capital Additions or for providing means of access thereto, or parking facilities therefor (including the costs of surveying the same and recording, title insurance and escrow fees and

-3-

charges), (c) insurance premiums, real estate taxes, water and
sewage charges and other carrying charges for such Capital
Additions during their construction, (d) fees and expenses of
legal counsel, (e) any documentary transfer or similar taxes, (f)
any applicable regulatory or administrative fees and charges, and
any costs, charges, fees or expenses paid or incurred in connec-
tion with obtaining any applicable permits, licenses, franchises,
authorizations, certificates of need, certificates of occupancy
and similar authorizations and entitlements and (g) all other
reasonable costs and expenses of Landlord or Tenant, as appli-
cable, and any lending institution which has committed to finance
the Capital Additions, including, but not limited to, (i) the
fees and expenses of their respective legal counsel, (ii) any
printing, duplicating and messenger expenses, (iii) any filing,
registration and recording taxes and fees, (iv) any documentary
transfer or similar taxes, (v) any title insurance charges and
appraisal fees, (vi) any rating agency fees and (vii) any com-
mitment or similar fees charged by any lending institution
financing or offering to finance any portion of such Capital
Additions.

"CMS" shall mean Continental Medical Systems, Inc., a
Delaware corporation.

"Code" shall mean the Internal Revenue Code of 1986, as
amended.

"Commencement Date" shall have the meaning ascribed to such
term in Section 3.1.

"Condemnation" shall have the meaning ascribed to such term
in Section 16.1(a).

"Condemnor" shall have the meaning ascribed to such term in
Section 16.1(d).

"Consolidated Financials" shall mean, for any fiscal year
(or other accounting period) for CMS and its consolidated
subsidiaries, statements of earnings and retained earnings and of
changes in financial position for such period and for the period
from the beginning of the respective fiscal year to the end of
such period and the related balance sheet as at the end of such
period, together with the notes thereto, all in reasonable detail
and setting forth in comparative form the corresponding figures
for the corresponding period in the preceding fiscal year (or
period), all of which shall be prepared in accordance with
generally accepted accounting principles.

"Consolidated Net Worth" shall mean for any period the sum
of the following for CMS and its consolidated subsidiaries, on a

consolidated basis, determined in accordance with generally accepted accounting principles:  (a) the amount of capital or stated capital (after deducting the cost of any shares held in the applicable entity's treasury); plus (b) the amount of capital surplus and retained earnings; or (c) in the case of a capital or retained earnings deficit, minus the amount of such deficit.

"Date of Taking" shall have the meaning ascribed to such term in Section 16.1(b).

"Encumbrance" shall have the meaning ascribed to such term in Article XXVI.

"Event of Default" shall have the meaning ascribed to such term in Section 17.1.

"Extended Term" shall have the meaning ascribed to such term in Section 3.2.

"Facility" shall mean the health care facility to be constructed on the Land, or with Landlord's consent, such other general health care facility, general health and rehabilitation hospital, psychiatric hospital, nursing home, retirement center, congregate living facility, health care related apartments or hotel, medical office building, or other medical facility with treatment, diagnostic, or surgical facilities for inpatient or outpatient care (which may include but is not limited to acute care inpatient facilities, skilled nursing facilities, inter- mediate care facilities, home health agencies, ambulatory care clinics or similar facilities) offering other related health care products and services being operated or proposed to be operated on the Land from time to time in accordance with the provisions of this Lease.

"Facility Mortgage" shall have the meaning ascribed to such term in Section 14.1.

"Facility Mortgagee" shall have the meaning ascribed to such term in Section 14.1.

"Fair Market Added Value" shall mean the Fair Market Value (as hereinafter defined) of the Property (including all Capital Additions without regard to the source of payment for such Capital Additions) less, the Fair Market Value of the Property determined as if no Capital Additions which were paid for by Tenant had been constructed.

"Fair Market Rental" shall mean, with respect to the Prop- erty (including any Capital Additions or portions thereof paid for by Landlord) the rental which a willing tenant not compelled

to rent would pay to a willing landlord not compelled to lease for the use and occupancy of such property pursuant to this Lease for the term in question, assuming that Tenant is not in default under this Lease.  For purposes of this Lease, Fair Market Rental shall be determined in accordance with the appraisal procedures set forth in Article XXV or in such other manner as shall be mutually agreed upon by Landlord and Tenant.

"Fair Market Value" shall mean, with respect to the Property, including all Capital Additions, the price that a willing buyer not compelled to buy would pay to a willing seller not compelled to sell for such property (a) assuming this Lease is not in effect with respect to the Property (b) assuming that such seller must pay any closing costs and title insurance premiums with respect to such sale and (c) assuming that the Property is fully licensed  by all governmental agencies having jurisdiction thereof, and is and will continue to be operated for the Primary Intended Usa and is otherwise a going concern. Notwithstanding the foregoing, the computation of Fair Market Value shall assume that this Lease is in effect with respect to the Property in the event that Tenant elects to acquire the Property pursuant to Section 15.2(b).  For purposes of this Lease, Fair Market Value shall be determined in accordance with the appraisal procedures set forth in Article XXV or in such other manner as shall be mutually agreed upon by Landlord and Tenant.

"Fair Market Value Purchase Price" shall mean the Fair Market Value of the Property less the Fair Market Added Value.

"Fiscal Year" shall mean the 12 month period commencing July 1 and terminating June 30.

"Fixed Term" shall have the meaning ascribed to such term in Section 3.1.

"Fixtures" shall have the meaning ascribed to such term in Section 2.1(d).

"Gross Revenues" shall mean all revenues received or receivable from, in connection with, incidental to or by reason of the operation of the Facility or any other use of the Property by Tenant, including without limitation all patient revenues received or receivable from, in connection with or incidental to the use of or otherwise by reason of all rooms, beds and other facilities provided, meals served, services performed, space or facilities subleased or goods sold on the Property, including without limitation (except as provided below) any other arrangements with third parties relating to the possession or use of any

portion of the Property; provided, however, that Gross Revenues shall not include:

(i)     any revenues from professional fees or charges by physicians or providers of ancillary services when and to the extent such charges are paid over to such physicians or providers of ancillary services, or are accompanied by separate charges for the use of the Facility or any portion thereof;

(ii)    non-operating revenues such as interest income or income from the sale of assets not sold in the ordinary course of business;

(iii)   contractual allowances or reserves (relating to any period during the Term of the Lease) for billings not paid by or received from the applicable governmental agencies or third party providers;

(iv)    allowances according to generally accepted accounting principles for uncollectible accounts, including credit card accounts, uncompensated care, charity care or other administrative discounts and collection expenses;

(v)     all patient billing credits and adjustments that are appropriate according to generally accepted accounting principles relating to health care accounting;

(vi)    all federal, state or local sales or excise taxes and any tax based upon or measured by Gross Revenues which is added to or made a part of the amount billed to the patient or other recipient of such services or goods, whether included in the bill or stated separately;

(vii)   all provider discounts for hospital or other medical facility utilization contracts, and credit card discounts;

(viii)  all costs of any federal, state or local governmental program imposed specially to provide or finance indigent patient care;

(ix)    all rental income, concession fees and other payments received by Tenant from any Affiliate of Tenant; provided, however, that any receipts of such Affiliate that would be deemed Gross Revenues if received by Tenant shall be considered to be part of Gross Revenues to the extent of Tenant's or any Affiliate's percentage interest in such receipts; and

(x)       revenues attributable to services actually
provided at locations other than the Land, such as home health
care.

"Guaranty" shall mean that certain Guaranty of Lease dated
as of even date with this Lease, to be executed by CMS in favor
of Landlord concurrently with the execution of this Lease, in
substantially the form of Exhibit A attached hereto and
incorporated herein by reference.

"Hazardous Substances" shall mean those substances,
materials, and wastes listed in the United States Department of
Transportation Table (49 CFR 172.101) or by the Environmental
Protection Agency as hazardous substances (40 CFR Part 302) and
amendments thereto, or such substances, materials and wastes
which are or become regulated under any applicable local, state
or federal law including, without limitation, any material, waste
or substance which is (i) governed, regulated, listed and/or
defined under the applicable Legal Requirements of the State
including all "hazardous materials" as defined under Arkansas
Code Annotated § 8-7-10(a)(2), all "hazardous wastes" as defined
under Arkansas Code Annotated §§ 8-7-203(b) and 8-7-304(7) and
all "hazardous substances" under Arkansas Code Annotated §§ 8-7-
403(a)(8), 8-7-503(8), and 8-7-702(2) (ii) petroleum and
petroleum products, (iii) asbestos, (iv) polychlorinated
biphenyls, (v) described as a "hazardous substance" pursuant to
Section 311 of the Clean Water Act, 33 U.S.C. Section 1251 et
seq. (33 U.S.C. Section 1321 or listed pursuant to Section 307 of
the Clean Water Act (33 U.S.C. Section 1317), (vi) defined as a
"hazardous waste" pursuant to Section 1004 of the Resource
Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq.
(42 U.S.C. Section 6903) or (vii) defined as a "hazardous
substance" pursuant to Section 101 of the Comprehensive
Environmental Response, Compensation and Liability Act, 42 U.S.C.
Section 9601 et seq. (42 U.S.C. Section 9601), as the same may be
amended from time to time.

"Impositions" shall mean all taxes (including without limi-
tation all real property taxes imposed upon the Land and
Improvements and all ad valorem, sales, use, single business,
gross receipts, transaction privilege, rent or similar taxes
relating to or imposed upon Tenant or its business conducted upon
the Land), assessments (including without limitation all sup-
plemental real property tax assessments or assessments for public
improvements or benefit, whether or not commenced or completed
prior to the date hereof and whether or not to be completed
within the Term), ground rents, water, sewer or other rents and
charges, excises, tax levies, fees (including without limitation
license, permit, franchise, inspection, authorization and similar
fees) and all other governmental charges, in each case whether

-8-

general or special, ordinary or extraordinary, foreseen or
unforeseen, of every character or nature whatsoever with respect
to or connected with the Property or the business conducted
thereon by Tenant (including all interest and penalties thereon
due to any failure or delay in payment thereof) which at any time
prior to, during or with respect to the Term hereof may be
assessed or imposed on or with respect to, or may be a lien upon
(a) Landlord's interest in the Property, (b) the Property or any
part thereof or any Rent therefrom or any estate, right, title or
interest therein or (c) any occupancy, operation, use or
possession of, or sales from, or activity conducted on or in
connection with the Property or the leasing or use of the Pro-
perty or any part thereof by Tenant.  Impositions shall not
include (1) any tax based on net income (whether denominated as a
franchise, capital stock or other tax) imposed upon Landlord or
any other person, (2) any transfer or net revenue tax imposed
upon Landlord or any other person or (3) any tax imposed with
respect to the sale, exchange or other disposition by Landlord of
any Property or the proceeds thereof, nor any tax, assessment,
tax levy or charge described in the first sentence of this
paragraph which is in effect at any time during the Term hereof
to the extent such tax, assessment, tax levy or charge is totally
or partially repealed, unless a tax, assessment, tax levy or
charge set forth in clause (1) or (2) is levied, assessed or
imposed expressly in lieu thereof, in which case the substitute
tax, assessment, tax levy or charge shall be deemed to be an
Imposition.

    "Improvements" shall have the meaning ascribed to such term
in Section 2.1(b).

    "Initial Improvements Costs" shall mean $9,105.099.

    "Initial Rent" shall mean the initial rent payable by Tenant
to Landlord pursuant to Section 4.1.

    "Insurance Requirements" shall mean all terms and condi-
tions of any insurance policy required by this Lease and all
requirements of the issuer of any such insurance policy.

    "Land" shall mean all of that certain real property situated
in the City of Fayetteville, County of Washington, State of
Arkansas and more particularly described in Exhibit B attached
hereto and incorporated herein by reference, and any other real
property acquired or leased and made subject to this Lease in
connection with a Capital Addition.

    "Lease" shall mean this document, as the same may be amended
from time to time in accordance herewith.

-9-

"Legal Requirements" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, common law, decrees and injunctions affecting the Property or the maintenance, construction, use, alteration, occupancy or operation thereof, whether now or hereafter enacted and in force (including any of the foregoing which may require repairs, modifications or alterations in or to the Property), all permits, licenses, franchises, authorizations, land use entitlements, zoning and regulations relating thereto, and all covenants, conditions, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Tenant (other than encumbrances created by Landlord without the consent of Tenant), at any time in force affecting the Property.

"Minimum Repurchase Price" shall mean the Initial Improvements Costs, plus any portion of a Capital Additions Cost which Landlord has actually paid, less the net amount (after deduction of all reasonable legal fees and other costs and expenses, including without limitation expert witness fees, incurred by Landlord in connection with obtaining any such proceeds or awards) of any proceeds of insurance paid to and retained by Landlord in accordance with Article XV of this Lease and of any Awards received by Landlord and not applied to restoration of the Property in accordance with Article XVI of this Lease.

"Notice" shall mean a notice given pursuant to Section 28.8 hereof.

"Officer's Certificate" shall mean a certificate of Tenant signed by the chief financial officer or another officer authorized so to sign by resolutions adopted by the board of directors or the articles of incorporation or by-laws of Tenant or by any other person whose power and authority to act has been authorized by delegation in writing by the chief financial officer of Tenant.

"Overdue Rate" shall mean, as of a specified date, a rate of interest equal to the Base Rate plus three percent, but in no event greater than the maximum rate of interest then permitted under applicable law.

"Payment Date" shall mean any due date for the payment of any installment of Base Rent.

"Percentage Rent" shall mean the percentage rent payable by Tenant to Landlord pursuant to Section 4.4.

"permitted Encumbrances" shall mean the matters, if any, set forth in Exhibit C attached hereto and incorporated herein by reference.

"Plans and Specifications" shall mean those certain final plans and specifications for the Facility dated February 14, 1990 and plans and specifications for the Facility prepared by Burt Taggart and Associates pursuant to an Architect's Contract dated February 27, 1990.

"Primary Intended Use" shall mean a 60 bed, 56,400 square foot, freestanding comprehensive medical rehabilitation hospital fully licensed by the State, plus such additional uses as are permitted by Landlord from time to time hereunder.

"Property" shall have the meaning ascribed to such term in Section 2.1.

"Rent" shall mean the Base Rent, Percentage Rent, Administrative Rent, Additional Rent and Additional Charges.

"State" shall mean the State of Arkansas.

"Taking" shall mean a taking or voluntary conveyance during the Term hereof of all or any part of the Property, or any interest therein, right with respect thereto or use thereof, as a result of, incidental to, or in settlement of any condemnation or other eminent domain proceedings affecting such Property, regardless of whether such proceedings shall have actually been commenced.

"Ten Year Treasury Rate" shall mean, as of the date of determination, the monthly average yield to maturity of actively traded marketable United States Treasury securities bearing a fixed rate of interest, adjusted for a constant maturity of ten years, as calculated by the Federal Reserve Board for the preceding calendar month and published in said Board's Statistical Release H. 15.

"Tenant's Personal Property" shall mean all machinery, equipment, furniture, furnishings, movable walls or partitions, computers or trade fixtures or other personal property, and consumable inventory and supplies, including, by way of example but not by way of limitation, sterilizer units, scrub sinks, mail boxes, desks, lamps, chairs, beds, bedstands, surgical lamps, water stills, fume hoods, non-affixed cabinetry, tables, and similar movable equipment, owned by Tenant and used or useful in Tenant's business on the Land but in no event any items included within the definition of Fixtures.

"Term" shall mean the Fixed Term and any Extended Terms, as the context may require, unless earlier terminated pursuant to the provisions of this Lease.

"Unavoidable Delays" shall mean delays due to strikes, lock-outs, inability to procure materials, power failures, acts of God, governmental restrictions, enemy action, civil commotion, unavoidable casualty and other causes beyond the control of the party responsible for performing an obligation hereunder, provided that lack of funds shall not be deemed a cause beyond the control of either party hereto.

## ARTICLE II
## LEASE OF PROPERTY

2.1   Property.   Landlord hereby leases to Tenant, and Tenant hereby hires from Landlord, upon the terms and subject to the conditions hereinafter set forth, all of Landlord's right, title and interest in and to all of the following (the "Property"):

(a)     the Land;

(b)     all buildings, structures and other improve-ments of every kind, including but not limited to the Facility, all buildings and structures hereafter constructed upon the Land and all alleyways and connecting tunnels, sidewalks, utility pipes, conduits and lines (on-site and off-site), parking areas, roadways and other related on-site and off-site improvements appurtenant to such buildings and structures presently or hereafter situated upon the Land, and any and all Capital Additions paid for by Landlord pursuant to Section 11.2 of this Lease (the "Improvements");

(c)     all easements, licenses, rights-of-way and appurtenances relating to the Land and the Improvements; and

(d)     all equipment (including non-movable medical equipment), machinery, fixtures and other items of property, including all components thereof, now and hereafter located in, on or used and incorporated into the Improvements, including without limitation all furnaces, boilers, heaters, electrical equipment, heating, plumbing, lighting, ventilating, refrigerating, incineration, air and water pollution control, waste disposal, air-cooling and air-conditioning systems, equipment and apparatus, sprinkler systems and fire and theft protection equipment, built-in oxygen and vacuum systems, wiring, tubing, central clock systems, doctor register systems,

elevators, dumb waiters, intercom systems, nurse call systems, affixed cabinetry and counters, pneumatic tube systems, vacuum cleaning systems, conveyor systems, paging systems, mill work, x-ray protection, pass-through boxes, exhaust systems, laboratory plumbing and piping, medical gas systems, nurse station counters, emergency generators and similar items incorporated into and made a part of the Improvements, all of which to the greatest extent permitted by law are hereby deemed by the parties hereto to constitute real estate, together with all replacements, modifications, alterations and additions thereto, but specifically excluding Tenant's Personal Property (the "Fixtures").

2.2   Construction.  Landlord has entered into a completion agreement ("Completion Agreement") for the construction of the Facility and pursuant thereto the scheduled date for completion of the Facility is June 1, 1991.  If for any reason the Facility is not completed by said date, Landlord shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease, or the obligations of Tenant hereunder, but in such case, Tenant shall not be obligated to pay rent or perform any other obligation of Tenant under the terms of this Lease, until the conditions for the commencement of the Term have been satisfied; provided however, if the Term has not commenced by September 1, 1994, this Lease shall automatically terminate, and neither party shall have any further rights or obligations hereunder.  For purposes of this Lease, Construction shall be defined as all on and off site improvements and building improvements shown on the Plans and Specifications.  Tenant hereby acknowledges its review and approval of the Plans and Specifications.  Landlord shall provide Tenant, upon request therefor, with copies of all affidavits and certifications by contractors that are within Landlord's possession and control, to the extent such affidavits and certifications may be required by Tenant in connection with its applications for Tenant's certificates and licenses for the Facility.

## ARTICLE III
## TERM OF LEASE

3.1   Term of Lease. The initial term of this Lease shall commence on the earlier to occur of (a) the date on which Landlord receives a Certificate of Occupancy or other statement from the governmental authority having jurisdiction over the Improvements stating that the structural elements of the Facility have been completed as necessary to permit the occupancy of the Facility and all licenses and approvals necessary for operation of the Facility for its Primary Intended Use or (b) the date on which the Tenant begins conducting business in the Facility (the "Commencement Date"), and, unless extended or terminated earlier

-13-

Nov.14. 2001  3:44AM    HEALTH CARE PROPER ( 040 II 0697                    46-4343   P. 2

in accordance with the provisions of this Lease, shall remain in
effect for ten years thereafter (the "Fixed Term").

3.2    Option to Extend Term of Lease.  Landlord hereby
grants to Tenant an option to extend the term of this Lease for
three additional consecutive five year renewal terms (the
"Extended Terms").  The Extended Terms shall be upon the same
terms and conditions as those set forth for the Fixed Term except
that Rent shall be the then current Fair Market Rental which,
unless otherwise mutually agreed to by Landlord and Tenant, shall
be determined by appraisal pursuant to the provisions of
Article XXV; provided that in no event shall the total annual
Rent for an Extension Term be less than the total Rent (excluding
Additional Rent) paid during the last year of the Term expiring
immediately prior to the Extension Term; provided further that if
the Rent for the Extension Term is determined by the foregoing
proviso no portion of the Rent for the Extension Term so
determined shall be allocated to Additional Rent (but Rent in
excess of such minimum may be so allocated).  Each such option
may only be exercised by Tenant if, at the time such option is
exercised, an Event of Default is not continuing, and shall be
exercised by Tenant by delivery of Notice to that effect to
Landlord not less than 180 days but not more than 360 days prior
to the date upon which this Lease otherwise would terminate.  The
failure of Tenant to exercise any of the options for the Extended
Terms within the respective times specified in this Section shall
thereby terminate any remaining such options.


## ARTICLE IV
## RENT

4.1    Payment of Initial Rent.  On the Commencement Date
Tenant shall pay to Landlord, as Initial Rent, the sum of
$321,000 in lawful money of the United States of America, in
immediately available funds, without right of offset.

4.2    Payment of Base Rent, Percentage Rent, Additional Rent
Administrative Rent and Additional Charges.  During the Term,
Tenant shall pay to Landlord at the times specified herein, in
lawful money of the United States of America, in immediately
available funds, without right of abatement, deduction, counter-
claim, defense, reduction, recoupment or offset, at the address
of Landlord as set forth in Section 28.8 or at such other place
or to such other person, firm or corporations as Landlord may
designate from time-to-time in a Notice, the Base Rent, the
Percentage Rent, the Additional Rent, Administrative Rent and, to
the extent payable to Landlord, the Additional Charges.

-14-

4.3   **Base Rent and Administrative Rent.**   Commencing on the
first Business Day of the first full calendar month occurring
after the Commencement Date and continuing thereafter on the
first day of each calendar month occurring thereafter during the
Term hereof, Tenant shall pay to Landlord the Administrative Rent
and one-twelfth of Base Rent; provided that the first payment of
Base Rent and Administrative Rent shall include an additional
payment for the partial calendar month occurring between the
Commencement Date and the first payment of Base Rent and Admin-
istrative Rent required under this paragraph. Any payment of
Base Rent or of Administrative Rent for a period of less than one
calendar month shall be pro-rated based upon the number of days
for which such Base Rent and Administrative Rent shall be due
divided by 30.

4.4   **Percentage Rent.**   Commencing on the 45th day following
the end of the first full Fiscal Year quarter following or com-
mencing on the date which falls 320 days after the Commencement
Date and every three months thereafter during the Term, Tenant
shall pay to Landlord as "Percentage Rent" an amount equal to
1.940% of the amount of the difference between the annualized
Gross Revenues for such quarter and the Base Period Gross
Revenues.

4.5   **Additional Rent.**   Commencing on the first Business Day
of the first full Fiscal Year quarter and every three months
thereafter during the Term, Tenant shall pay to Landlord as
"Additional Rent" an amount equal to .7% of the annualized amount
of the Gross Revenues for such quarter other than Gross Revenues
attributable to medicare and medicaid patients.

4.6   **Confirmation of Percentage Rent.**   Tenant shall
utilize, or cause to be utilized, an accounting system for the
Property, in accordance with Tenant's usual and customary prac-
tices and in accordance with generally accepted accounting prin-
ciples, which will accurately record and reflect all Gross Reve-
nues. Tenant shall retain, for at least six years following the
end of each Fiscal Year (and in all events until the reconcili-
ation described in Section 4.7 for such Fiscal Year has been
made), reasonably adequate records conforming to the aforemen-
tioned accounting system showing all Gross Revenues for such
Fiscal Year. Landlord, at its own expense, except as provided
hereinbelow, shall have the right, from time to time, to audit or
cause to be audited by its accountants or other authorized repre-
sentatives the information set forth in the Officer's Certificate
regarding Percentage Rent referred to in Section 4.7. No such
audit shall be commenced by Landlord more than one year after the

-15-

Officer's Certificate for such period is received by Landlord,
unless (i) there is an Internal Revenue Service audit of Landlord
or an Affiliate of Landlord that makes such inquiry relevant; or
(ii) Landlord has conducted an audit of another period within 12
months of its current audit request and such audit has disclosed
that the Gross Revenues received by Tenant for the Fiscal Year to
which such audit relates exceeds those reported by more than five
percent (5%) or such audit gives Landlord a reasonable basis to
believe that any prior year audit is off by more than five per-
cent (5%).  In connection with such audits, Landlord (or its
accountants or authorized representatives, as the case may be)
may examine, audit and copy Tenant's records with respect thereto
(including supporting data and sales and excise tax returns),
subject to any prohibitions or limitations on disclosure of any
such data under applicable law or regulations, including without
limitation any duly enacted "Patients' Bill of Rights" or similar
legislation and such reasonable limitations as may be necessary
to preserve the confidentiality of the Facility-patient rela-
tionship and the physician-patient privilege.  If any such audit
correctly discloses a deficiency in the payment of Percentage
Rent, Tenant shall forthwith pay to Landlord the amount of the
deficiency, together with interest at the Overdue Rate, for the
period from the date when such payment should have been made to
the date when such payment is made.  If any such audit discloses
that Gross Revenues actually received by Tenant for the Fiscal
Year to which such audit relates exceed those reported by Tenant
by more than five percent, Tenant shall pay all of Landlord's
costs, charges, fees and expenses related to such audit.  Any
proprietary information obtained by Landlord pursuant to the pro-
visions of this Section shall be treated as confidential, except
that, subject to appropriate confidentiality safeguards, such
information may be used in any litigation between Landlord and
Tenant and may be disclosed by Landlord to Landlord's lenders or
prospective lenders.  The obligations of Tenant contained in this
Section shall survive the expiration or earlier termination of
this Lease.

     4.7   Certificates Regarding Percentage Rent.  Each payment
of Percentage Rent shall be delivered to Landlord, together with
an Officer's Certificate setting forth the calculation for the
quarter and the Fiscal Year to date.  In addition, within 90 days
after each Fiscal Year, Tenant shall deliver to Landlord an
officer's Certificate reasonably acceptable to Landlord setting
forth the Gross Revenues, together with Tenant's computation of
Percentage Rent paid or payable, for such period.  If the Percen-
tage Rent for any Fiscal Year, as shown in any such certificate,
exceeds the sum of the quarterly payments of Percentage Rent
previously paid by Tenant with respect to such Fiscal Year,
Tenant promptly shall remit to Landlord the amount of such
deficit.  If the Percentage Rent for such Fiscal Year, as shown

-16-

in such certificate, is less than the sum of the quarterly
payments of Percentage Rent previously paid by Tenant with
respect to such Fiscal Year, Landlord shall credit such sum to
the payment of Percentage Rent next due.  The obligation of
Tenant to pay to Landlord Percentage Rent shall survive the
expiration or earlier termination of the Term, and a final
reconciliation (taking into account, among other relevant
adjustments, any contractual allowances which are accrued after
such expiration or termination date but which relate to Gross
Revenues accrued prior to such expiration or termination date and
Tenant's good faith best estimate of the amount of any unresolved
contractual allowances) shall be made not later than seven years
after expiration or termination.  Tenant shall advise Landlord
within 60 days after such expiration or termination date of
Tenant's best estimate at that time of the approximate amount of
such adjustments, which estimate shall not be binding on Tenant
or have any legal effect whatsoever.

    4.8    Additional Charges.  Tenant shall pay and discharge as
and when due and payable all Impositions and other amounts,
liabilities and obligations which Tenant assumes or agrees to pay
under this Lease.  If Tenant fails or refuses to pay any of the
items referred to in the immediately preceding sentence, Tenant
shall promptly pay and discharge every fine, penalty, interest
and cost which may arise or accrue for the non-payment or late
payment of such items.  The aforementioned amounts, liabilities,
obligations, Impositions, fines, penalties, interest and costs
are referred to herein as "Additional Charges."  The Additional
Charges shall constitute rent hereunder.  If any Rent (but as to
Additional Charges, only those which are payable directly to
Landlord) shall not be paid on its due date, Tenant shall pay to
Landlord on demand, as an Additional Charge, a late charge (to
the extent permitted by law) computed at the Overdue Rate on the
amount of such Rent from the due date of such Rent to the date
such Rent is paid.  Any payment by Tenant of Additional Charges
to Landlord pursuant to any requirement of this Lease shall
relieve Tenant of its obligation to pay such Additional Charges
to the entity to which they would otherwise be paid.

    4.9    Net Lease.  This Lease is what is commonly called a
"net lease", it being understood that Landlord shall receive all
Rent as provided in this Article free and clear of any and all
Impositions, Encumbrances, charges, obligations or expenses of
any nature whatsoever in connection with the ownership and opera-
tion of the Property.  In addition to the rent reserved by this
Article, except as expressly provided herein to the contrary,
Tenant shall pay to the parties respectively entitled thereto all
Impositions, insurance premiums, operating charges, maintenance
charges, construction costs and any other charges, costs and
expenses which arise or may be contemplated under any provisions

-17-

of this Lease during the Term hereof.  All of such charges, costs
and expenses shall constitute additional rent, and upon the
failure of Tenant to pay any such costs, charges or expenses,
Landlord shall have the same rights and remedies as otherwise
provided in this Lease for the failure of Tenant to pay Rent and
Landlord shall be indemnified and saved harmless by Tenant from
and against the same.  It is the intention of the parties hereto
that this Lease shall not be terminable for any reason by the
Tenant and that Tenant shall in no event be entitled to any
abatement of or reduction in Rent payable under this Lease except
as herein expressly provided.  Any present or future law to the
contrary shall not alter this agreement of the parties.

## ARTICLE V
## IMPOSITIONS

5.1   Payment of Impositions.  Tenant shall pay, or cause to
be paid, all Impositions prior to delinquency and before any
fine, penalty, interest or cost may be added for non-payment
(subject to Tenant's rights of contest pursuant to the provi-
sions of Article XIII).  Such payments shall be made directly to
the authorities levying such Impositions, if possible.  Tenant
shall, promptly upon request by Landlord, furnish to Landlord
original or certified copies of receipts or other reasonably
satisfactory evidence of such payments.  Tenant's obligation to
pay Impositions shall be deemed absolutely fixed upon the date
such Impositions become a lien upon the Property or any part
thereof.  If any such Imposition may, at the option of the payor,
lawfully be paid in installments (whether or not interest shall
accrue on the unpaid balance of such Imposition), and so long as
no Event of Default shall have occurred hereunder and be con-
tinuing, Tenant may pay the same (and shall pay any accrued
interest on the unpaid balance of such Imposition) in install-
ments, and in such event shall pay such installments (subject to
Tenant's right of contest pursuant to the provisions of Article
XIII) as the same become due and before any fine, penalty,
premium, further interest or cost is added thereto.  Landlord
shall, at its expense and to the extent required or permitted by
applicable laws and regulations, prepare and file all returns
with respect to Landlord's net income, gross receipts, sales,
use, single business, transaction privilege, rent, ad valorem and
franchise taxes, and with respect to taxes on Landlord's capital
stock.  Tenant shall, at its expense, and to the extent required
or permitted by applicable laws and regulations, prepare and file
all other tax returns and reports with respect to any Imposition
as may be required by governmental agencies or authorities.  If
any refund shall be due from any taxing authority with respect to
any Imposition paid by Tenant, the same shall be paid over to and

-18-

retained by Tenant unless an Event of Default shall have occurred hereunder and be continuing, in which case such refund shall be paid over to and retained by Landlord. Any such funds retained by Landlord due to an Event of Default shall be applied as provided in Article XVII. Landlord and Tenant shall, each upon a request by the other, provide such information as is maintained by the party to whom the request is made with respect to the Property as may be reasonably necessary to prepare any required returns or reports. If any governmental agency or authority classifies any property covered by this Lease as personal property, Tenant shall file all personal property tax returns in such jurisdictions where it may legally so file. Landlord, to the extent it possesses the same, and Tenant, to the extent it possesses the same, will provide to the other party, promptly upon request, cost and depreciation records reasonably necessary for filing returns for any property so classified as personal property. If Landlord is legally required to file any personal property tax returns, Landlord shall provide Tenant with copies of any assessment notices with respect thereto in sufficient time for Tenant to file a protest with respect thereto if it so elects pursuant to Article XIII. If no Event of Default is then continuing, Tenant may at its option and sole cost and expense, upon notice to Landlord, protest, appeal or institute such other proceedings as Tenant reasonably may deem appropriate to effect a reduction of real estate or personal property assessments so long as such action is conducted in good faith and with due diligence. In such event, Landlord, at Tenant's sole cost and expense, shall fully cooperate with Tenant in such protest, appeal, or other action. Tenant hereby agrees to indemnify, defend, save and hold Landlord harmless from and against any and all losses, demands, claims, obligations and liabilities against or incurred by Landlord in connection with such cooperation by Landlord. Billings by either party to the other for reimbursement of personal property taxes shall be accompanied by copies of a bill therefor and evidence of payments thereof which identify the personal property with respect to which such payments have been made.

5.2   **Notice of Impositions.**  Landlord shall give prompt Notice to Tenant of all Impositions payable by Tenant hereunder of which Landlord at any time has knowledge. Notwithstanding the foregoing, however, Landlord's failure to give any such Notice shall in no way diminish Tenant's obligations hereunder to pay such Impositions, but Landlord shall be responsible for any fine, penalty or interest resulting from its failure to give such notice and any default by Tenant hereunder shall be obviated for a reasonable time after Tenant receives Notice of any Imposition which it is obligated to pay.

5.3   **Adjustment of Impositions.**  Impositions imposed with respect to the tax period during which the Term expires or terminates shall be adjusted and prorated between Landlord and Tenant, whether or not such Imposition is imposed before or after such expiration or termination, so that Tenant is only obligated to pay that portion of such Imposition(s) pertaining to the tax period within the Term.  The obligation of Tenant to pay its prorated share of Impositions shall survive expiration or earlier termination of this Lease.

5.4   **Utility Charges.**  Tenant shall pay or cause to be paid all charges for all utilities, including but not limited to electricity, power, gas, oil and water, used in the Property during the Term.

5.5   **Insurance Premiums.**  Tenant shall pay or cause to be paid all premiums for insurance coverage required to be maintained pursuant to Article XIV.

### ARTICLE VI
### TERMINATION OR ABATEMENT OF LEASE

6.1   **No Termination or Abatement.**  Except as otherwise specifically provided in this Lease, Tenant, to the full extent permitted by law, shall remain bound by this Lease in accordance with its terms.  Tenant shall not take any action without the prior written consent of Landlord to modify, surrender or terminate this Lease.  The obligations of Landlord and Tenant hereunder shall be separate and independent covenants and agreements, and Rent and all other sums shall continue to be payable by Tenant hereunder in any event unless the obligation of Tenant to pay the same terminates pursuant to the express provisions of this Lease or by termination of this Lease (other than by reason of an Event of Default).  Without limiting the generality of the immediately preceding sentence, Tenant shall not seek or be entitled to any abatement, deduction, deferment or reduction of Rent, or set-off against Rent, nor shall the respective obligations of Landlord and Tenant be otherwise affected by reason of (a) any damage to, or destruction of, all or any portion of the Property from whatever cause or any Taking of all or any portion of the Property; (b) the lawful or unlawful prohibition of, or restriction upon, Tenant's use of all or any portion of the Property, or the interference with such use or with Tenant's quiet enjoyment of the Property by any person or entity, or by reason of eviction by paramount title; (c) any claim which Tenant has or may have against Landlord by reason of any default or breach of any warranty by Landlord under this Lease or any other agreement between Landlord and Tenant or to which Landlord and

-20-

Tenant are parties; (d) any bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding up or other proceeding affecting Landlord or any assignee or transferee of Landlord; or (e) any other cause, whether similar or dissimilar to any of the foregoing (other than a discharge of Tenant from any such obligations as a matter of law). Tenant hereby specifically waives all rights, arising from any occurrence whatsoever, which (i) may now or hereafter be conferred upon it by law to modify, surrender or terminate this Lease or quit or surrender all or any portion of the Property or (ii) entitle Tenant to any abatement, reduction, suspension or deferment of Rent or other sums payable by Tenant hereunder, except as otherwise specifically provided in this Lease.

6.2   **Abatement Procedures.**   Upon a partial Taking as described in Section 16.5, or damage to or destruction of the Property as contemplated in Section 15.2, this Lease shall not terminate, but the Base Rent shall be abated in a manner and to an extent fair, just and equitable to both Tenant and Landlord. Such abatement shall take into consideration, among other things, the number of useable beds in the Facility, the amount of square footage remaining in the Facility and the type and amount of Gross Revenues affected by such partial or temporary Taking, damage or destruction.   If Landlord and Tenant are unable to agree upon the amount of such abatement within 90 days after (i) such partial Taking or (ii) such damage or destruction, the matter may be submitted to arbitration in accordance with Section 28.14 hereof.

### ARTICLE VII
### OWNERSHIP OF PROPERTY;
### TENANT'S PERSONAL PROPERTY SECURITY INTEREST

7.1   **Ownership of the Property.**   As between Landlord and Tenant the Property is, and throughout the Term shall continue to be, the property of Landlord.   Tenant has only the right to the exclusive possession and use of the Property, upon the terms and subject to the conditions set forth in this Lease.

7.2   **Tenant's Personal Property; Security Interest.**   Tenant may, at its expense, install, affix, assemble or place on the Property any items of Tenant's Personal Property and may, subject to the conditions set forth below, remove Tenant's Personal Property upon the expiration or earlier termination of this Lease (other than a termination upon an Event of Default) so long as any damage caused by such removal shall be promptly repaired by Tenant.   Notwithstanding the foregoing, in order to secure the payment and the performance of all of Tenant's obligations under

-21-

this Lease, Tenant hereby grants to Landlord a security interest in (and hereby pledges and collaterally assigns to Landlord) all of Tenant's rights, title and interest in and to Tenant's Personal Property, all whether now existing or hereafter acquired and hereby further agrees to execute and deliver to Landlord, forthwith after demand by Landlord from time to time, any security agreement in a reasonable form determined by Landlord and such additional writings and instruments, including without limitation financing statements, as may be required by Landlord for the purpose of effectuating the intent of this sentence and Tenant agrees that Landlord shall have with respect to all Personal Property all rights and remedies of a secured party under the Uniform Commercial Code as adopted in the State, including, but not limited to, the right after the occurrence of an Event of Default to use or sell Tenant's Personal Property, and Landlord shall not be required to remove any of such Personal Property from the Property and in no event shall Landlord be liable to Tenant for use of such Personal Property. Pending disposition of such Personal Property by Landlord, the Landlord shall be entitled to use such Personal Property in connection with the operation (if any) of the Facility. Tenant shall not permit the Property or Personal Property to become subject to any liens or encumbrances of any kind without first obtaining the prior written consent of Landlord, except that no such consent shall be required for any purchase money security interest in and relating to the acquisition of equipment so acquired. This Lease and the security interest granted Landlord hereby shall be subordinate to any such purchase money security interest. Landlord further agrees that Tenant may lease Personal Property, and Landlord shall execute and deliver such agreements as may be reasonably required by any equipment lessor or the holder of a purchase money security interest to confirm that Landlord's lien on the Personal Property in question is subordinate to the rights of such equipment lessor or lender and in each case Tenant shall obtain from the holder of the purchase money debt or lessor of Personal Property, as the case may be, its agreement to (i) notify Landlord or its successors and assigns of any default by Tenant, (ii) allow Landlord or its successors and assigns an opportunity to cure any default, (iii) recognize Landlord or its successors and assigns as succeeding to Tenant's rights under the agreement in question and to the undisturbed use of the equipment, provided that Landlord fully complies with the terms of such agreement. Tenant shall provide and maintain on the Property during the entire Term such Tenant's Personal Property as shall be necessary to operate the Facility in compliance with all licensure and certification requirements, in compliance with all Legal Requirements and Insurance Requirements and otherwise in accordance with customary practice in the health care industry with respect to the Primary Intended Use or other uses then conducted on the Property by Tenant and permitted hereunder. All

-22-

Tenant's Personal Property not removed by Tenant within ten days following the expiration or earlier termination of this Lease, shall be considered abandoned by Tenant and may be appropriated, sold, destroyed or otherwise disposed of by Landlord without first giving Notice thereof to Tenant and without any payment or obligation to account to Tenant. Tenant shall, at its sole cost and expense, restore the Property to the condition required by Section 10.1(d), including repair of all damage to the Property caused by the removal of Tenant's Personal Property, whether effected by Tenant or Landlord.

## ARTICLE VIII
### CONDITION AND USE OF PROPERTY

8.1   Condition of the Property.  By taking possession of the Property, Tenant will acknowledge that it has examined and otherwise has knowledge of the condition of the Property prior to the execution and delivery of this Lease, that Tenant has found the Property to have been completed in accordance with the Plans and Specifications, to be approved for occupancy by all appropriate governmental agencies having jurisdiction over issues related to occupancy, and to be satisfactory to Tenant in every respect including for its Primary Intended Use, and that Tenant is leasing the Property "AS IS" in its then condition, without representation or warranty by Landlord and subject to (a) the existing state of title, including all covenants, conditions, restrictions, easements, licenses, Legal Requirements, mortgages, deeds of trust, assignments of leases, fixture filings and other financing instruments and any and all other matters of record and otherwise except to the extent any of the foregoing were caused or created by Landlord, and (b) matters which would be disclosed by an inspection of the Property or by an accurate survey of the Land.  Tenant waives any and all claims, demands and cause or causes of action heretofore or hereafter arising against Landlord with respect to the condition of the Property.  LANDLORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY OR ANY PART THEREOF, EITHER AS TO ITS DESIGN, CONDITION OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE OR OTHERWISE, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, LATENT OR PATENT.  TENANT ACKNOWLEDGES AND AGREES THAT THE PROPERTY HAS BEEN INSPECTED BY TENANT AND IS SATISFACTORY TO IT IN ALL RESPECTS.  Landlord hereby assigns to Tenant any and all guarantees or warranties made by contractors, subcontractor and others in connection with the construction of the Facility, the Improvements and Fixtures.  To the extent any such guarantees or warranties cannot be assigned, Landlord shall use its best efforts to enforce such guarantees and warranties but shall not be obligated to incur any costs or expenses in so doing.

8.2   Use of the Property.

(a)     Tenant shall proceed with all due diligence, and shall exercise its reasonable efforts, to obtain and maintain in effect all permits, licenses, authorizations and approvals needed to use and operate the Property and the Facility for Tenant's Primary Intended Use in accordance with all Legal Requirements.

(b)     Throughout the entire Term, Tenant shall use or cause to be used the Property in accordance with its Primary Intended Use and for such other uses as may be necessary in connection with or incidental to such use.  Tenant shall not use the Property or any portion thereof for any other purpose whatsoever without the prior written consent of Landlord.  The parties agree that Landlord's consent will not be deemed to be unreasonably withheld if, in the reasonable opinion of Landlord, the Tenant's proposed use of the Property will significantly alter the character or purpose or detract from the value or operating efficiency of the Property, or significantly impair the revenue-producing capability of the Property.  No use shall be made or permitted to be made of the Property and no acts shall be done which violate any Legal Requirements or Insurance Requirements or which will cause the cancellation of any insurance policy covering the Property or any part thereof, nor shall Tenant sell or otherwise provide to patients therein, or permit to be kept, used or sold in about or under the Property any Hazardous Substance (except in strict compliance with all Legal Requirements with respect to such substances other than asbestos and hydrocarbons) or any other article which may be prohibited by the Legal Requirements or Insurance Requirements.  Tenant shall, at its sole cost, comply with all of the requirements pertaining to the Property of any insurance board, association, organization or company necessary for the maintenance of the insurance required pursuant to this Lease.

(c)     Tenant shall not commit or suffer to be committed any waste nor shall Tenant cause or permit any nuisance on the Property.

(d)     Tenant shall neither suffer nor permit all or any portion of Tenant's Personal Property or the Property, including any Capital Addition whether or not financed or paid for by Landlord, to be used in such a manner as (i) may impair the owner's title thereto or to any portion thereof or (ii) may make possible a claim or claims of adverse usage, adverse possession or implied dedication of all or any portion of the Property to the public, except as is necessary in the ordinary and prudent operation of the Property.

-24-

8.3   **Landlord to Grant Easements.**  Subject to the provisions of this Section 8.3, Landlord shall, from time to time so long as no Event of Default has occurred and is continuing, at the request of Tenant and at Tenant's sole cost and expense (but subject to the approval of Landlord, which approval shall not be unreasonably withheld or delayed), (a) grant easements and other rights in the nature of easements burdening the Property for the exclusive benefit of real property adjacent to the Land or for the exclusive use and enjoyment of persons or entities specified by Tenant in such request but only as may be necessary for the operations of the Facility; (b) dedicate or transfer unimproved portions of the Property for road, highway or other public purposes but only as may be necessary for the operation of the Facility; (c) execute petitions to have the Property annexed to any municipal corporation or utility district; and (d) execute amendments to any covenants, conditions, restrictions and equitable servitudes affecting the Property, but only if each such grant, dedication, transfer, petition or amendment is not detrimental to the proper conduct of the business of Tenant on the Property and does not materially reduce the value of the Property in Landlord's reasonable discretion.

## ARTICLE IX
### LEGAL REQUIREMENTS AND INSURANCE REQUIREMENTS

9.1   **Compliance with Legal Requirements, Insurance Requirements and Instruments.**  Subject to the rights of Tenant as provided in Article XIII relating to permitted contests, Tenant, at its sole cost and expense, shall promptly (a) comply with all applicable Legal Requirements and Insurance Requirements with respect to the use, operation, maintenance, repair and restoration of the Property, whether or not compliance therewith shall require structural change in any of the Improvements or interfere with the use and enjoyment of the Property, and (b) procure, maintain and comply with all appropriate licenses, certificates of need, provider agreements and other permits, licenses, franchises and authorizations required for any use of the Property and Tenant's Personal Property then being made, and for the proper erection, installation, operation and maintenance of the Property or any part thereof, including without limitation any Capital Additions.

9.2   **Covenants Regarding Legal Requirements.**  Tenant covenants and agrees that it shall not use the Property or Tenant's Personal Property for any purpose which violates the Legal Requirements.  Tenant shall acquire and maintain all appropriate licenses, certificates, permits, provider agreements, franchises,

authorizations and approvals necessary to operate the Property in its customary manner for the Primary Intended Use, and any other use conducted on the Property by Tenant and permitted by Landlord hereunder.   If no Event of Default has occurred and is then continuing, Tenant may, however, upon prior Notice to Landlord, contest the legality or applicability of any such Legal Require- ment or any licensure or certification decision if Tenant maintains such action in good faith, with due diligence, without prejudice to Landlord's rights hereunder and at Tenant's sole cost and expense.   If by the terms of any such Legal Requirement compliance therewith, pending the prosecution of any such pro- ceeding, may legally be delayed without the incurrence of any lien, charge, fine, penalty or other liability of any kind against the Property or Tenant's leasehold interest therein and without subjecting Tenant or Landlord to any liability, civil or criminal, for failure so to comply therewith, Tenant may delay compliance therewith until the final determination of such pro- ceeding.   If any lien, charge or civil or criminal liability would be incurred by reason of any such delay, Tenant, subject to the prior written consent of Landlord (which consent shall not be unreasonably withheld), may nonetheless contest and/or delay as aforesaid provided that such contest or delay, as the case may be, will not subject Landlord or Tenant to criminal liability and Tenant (a) furnishes to Landlord security reasonably satis- factory to Landlord against any loss or injury by reason of such contest or delay, and (b) prosecutes the contest with due diligence and in good faith.

## ARTICLE X
## CONDITION OF THE PROPERTY

### 10.1  Maintenance and Repair.

(a)      Tenant, at its sole cost and expense, shall keep the Property and all private roadways, sidewalks and curbs appurtenant thereto and which are under Tenant's control in good order, condition and repair and, except as otherwise expressly provided to the contrary in Article XIV, XV, or XVI with reason- able promptness, shall make all necessary and appropriate repairs and replacements thereto of every kind and nature, whether interior or exterior, structural or nonstructural, ordinary or extraordinary, patent or latent, foreseen or unforeseen, or arising by reason of a condition existing prior to the commence- ment of the Term of this Lease and regardless of the cause necessitating repair.   Tenant shall also be obligated at its expense to make all repairs, modifications and renovations necessary to comply with all licensing, safety and health and building code, regulations applicable to the Property so that it

can be legally operated for its Primary Intended Use. All repairs by Tenant shall, to the extent reasonably achievable, be at least equal in quality to the original work. Tenant shall not take or omit to take any action, the taking or omission of which might materially impair the value or the usefulness of all or any portion of the Property for the Primary Intended Use. Tenant shall give Landlord ten days prior written notice of any repair, replacement, modification or renovation pursuant to this Section the cost of which exceeds $100,000 and, prior to commencing any such repair, replacement, modification or renovation, shall provide to Landlord either (i) a lien payment and completion bond in form and substance and issued by a surety reasonably acceptable to Landlord or (ii) a payment and completion guaranty in form and substance and executed by a guarantor reasonably acceptable to Landlord provided that CMS shall be an acceptable guarantor if, at such time, its financial condition, in the sole opinion of Landlord, is no worse than its financial condition at the time of its execution of this Lease.

(b)    Except as expressly provided in this Article and Article XIV and XV, Landlord shall not under any circumstances be required to build or rebuild any improvement on the Property, or to make any repairs, replacements, alterations, restorations or renewals of any nature or description to the Property, whether interior or exterior, structural or non-structural, ordinary or extraordinary, patent or latent, foreseen or unforeseen, or to make any expenditure whatsoever with respect thereto, in connection with this Lease, nor shall Landlord under any circumstances be required to maintain the Property in any other way, except as specifically provided herein. Tenant hereby waives, to the fullest extent permitted by law, the right to make repairs at the expense of Landlord pursuant to any law or equitable principle in effect at the time of the execution of this Lease or hereafter enacted. Landlord shall have the right to give, record and post, as appropriate, notices of non-responsibility under any mechanic's lien laws now or hereafter existing, and any other notices of a similar nature that Landlord may reasonably elect to give, record or post from time to time during the Term.

(c)    Nothing contained in this Lease, and no action or inaction by Landlord, shall be deemed or construed in any manner as (i) constituting the consent or request of Landlord, expressed or implied, to any contractor, subcontractor, laborer, materialman or vendor to or for the performance of any labor or services or the furnishing of any materials or other property for the construction, alteration, addition, repair or demolition of or to all or any portion of the Property or (ii) giving Tenant any right, power or permission to contract for or permit the performance of any labor or services or the furnishing of any

-27-

materials or other property in such a manner as would permit the making of any claim against Landlord with respect thereto, or to make any agreement that may create, or in any way may be the basis for the assertion of any right, title, interest, lien, claim or other encumbrance upon the estate of Landlord in all or any portion of the Property.

(d)     Unless Landlord conveys title to any of the Property to Tenant pursuant to the provisions of this Lease, Tenant shall, upon the expiration or earlier termination of this Lease, vacate and surrender the Property to Landlord in the condition in which the Property was originally received from Landlord, except as repaired, rebuilt, restored, altered or added to as permitted or required by the provisions of this Lease, and except for ordinary wear and tear (but subject to the obligation of Tenant under this Section to maintain the Property in good order, condition and repair during the entire Term of this Lease) and except for damage or destruction by casualty or condemnation which Tenant is not required to repair by the provisions of this Lease.

10.2   Encroachments and Restrictions.  If any of the Improvements shall at any time during the Term violate any agreement or condition contained in any lawful covenant, condition, restriction, equitable servitude or other agreement affecting all or any portion of the Property, or shall impair the rights of others under any easement or right-of-way burdening the Property, provided that such agreement, covenant, condition, restriction or easement has not been created by Landlord, then promptly upon the request of Landlord, or at the behest of any person affected by violation or impairment and in such case, in the event of an adverse final determination, Tenant shall either (a) obtain valid and effective waivers or settlements of all claims, liabilities and damages resulting from each such encroachment, violation or impairment, whether the same shall affect Landlord or Tenant, provided that Landlord shall consent to all such settlements or waivers or (b) make such changes in the Improvements and take such other actions as Tenant in the reasonable and good faith exercise of its judgment deems practicable to remove such encroachment and to end such violation or impairment, including, if necessary, the alteration of any of the Improvements provided that Landlord shall consent to all such alterations and the changes are not the result of any condition created solely by Landlord.  In any event Tenant shall, subject to Landlord's consent, take all such actions as may be necessary in order to be able to continue the operation of the Improvements for the then existing use substantially in the manner and to the extent the Improvements were operated prior to the assertion of such violation or impairment.  Tenant shall not be responsible for any claims covered by Landlord's title insurance policy, and

Landlord agrees that any proceeds recovered under such title insurance policy shall be made available to remedy the claimed violation or restriction.

ARTICLE XI
CAPITAL ADDITIONS

11.1  Construction of Capital Additions.

(a)      If no Event of Default shall have occurred and be continuing, Tenant may, subject to the terms and conditions contained in this Article, construct or install Capital Additions on the Property with the prior written approval of Landlord, which approval shall not be unreasonably withheld or delayed. Tenant shall not be permitted to create any Encumbrance on the Property in connection with any such Capital Addition.

(b)      Prior to commencing construction of any Capital Addition, Tenant shall submit to Landlord in writing a proposal setting forth in reasonable detail any proposed Capital Addition and shall provide to Landlord such plans and specifications, permits, licenses, contracts and other information concerning the proposed Capital Addition as Landlord may reasonably request.  Without limiting the generality of the foregoing, such proposal shall indicate the approximate projected cost of constructing such Capital Addition, the use or uses to which it will be put and a good faith estimate of the change, if any, in the Gross Revenues that Tenant anticipates will be caused by the addition of such Capital Addition to the Leased Property.  Tenant shall not commence to build any Capital Addition unless Tenant shall first have provided Landlord with either (i) a lien payment and completion bond in form and substance and issued by a surety reasonably acceptable to Landlord or (ii) a payment and completion guaranty in form and substance and executed by a guarantor reasonably acceptable to Landlord, provided that CMS shall be an acceptable guarantor if, at such time, its financial condition, in the sole opinion of Landlord, is no worse than its financial condition at the time of its execution of this Lease.

(c)      No Capital Addition shall be made which would tie in or connect any Improvements on the Property with any other improvements on property adjacent to the Property (and not part of the Property covered by this Lease), including without limitation, tie-ins of buildings or other structures or utilities unless Tenant shall have obtained the prior written consent of Landlord, which consent Landlord may grant, withhold or delay in its sole discretion.  All proposed Capital Additions shall be architecturally integrated and consistent with the Property.

-29-

## 11.2  Capital Additions Financed or Paid for by Landlord.

(a)    Tenant shall request that Landlord provide or arrange financing for any Capital Addition by providing to Landlord, such information about the Capital Addition as Landlord may reasonably request.  Landlord may, but shall be under no obligation to, meet the request, and within 30 days of receipt of such information, Landlord shall notify Tenant as to whether it will finance the proposed Capital Addition and, if so, the terms and conditions upon which it would do so, including the terms of any amendment to this Lease (including, without limitation, an increase in Base Rent to compensate Lessor for the additional funds advanced by it).  In no event shall the portion of the material, labor charges and fixtures be less than seventy-five percent (75%) of the total amount of such cost.

(b)    If Landlord elects to finance the Capital Additions Cost of the proposed Capital Addition, Tenant shall provide Landlord with the following (unless waived by Landlord in writing):

(i)    prior to any disbursement of funds, such information, certificates, licenses, permits, authorizations, evidence of zoning and other documents reasonably requested by Landlord, or by any third party lender with whom Landlord has agreed or may agree to provide financing, as necessary to confirm that Tenant will be able to use the Capital Addition upon completion thereof in accordance with the Primary Intended Use for such Capital Addition, including all required federal, state or local government licenses, permits, authorizations and approvals;

(ii)    prior to any disbursement of funds, an Officer's Certificate and, if requested, a certificate from Tenant's architect, setting forth in reasonable detail the projected (or actual, if available) Capital Additions Cost;

(iii)    prior to or coincident with the first disbursement of funds, an amendment to this Lease (together with a memorandum thereof in recordable form), duly executed and acknowledged, in form and substance reasonably satisfactory to Landlord, providing for the change in the Base Rent, the legal description of any land obtained in connection with such Capital Addition and such other provisions as may be necessary or appropriate;

(iv)    prior to or coincident with payment for any land obtained in connection with such Capital

-30-

Addition, a deed conveying to Landlord title to such land, which title shall be free and clear of any liens, encumbrances or other exceptions to or matters affecting title except those approved by Landlord, and, upon completion of the Capital Addition, a final as-built survey thereof reasonably satisfactory to Landlord;

(v)        during construction and following completion of the Capital Addition, endorsements to any outstanding policy of title insurance covering the Property, or commitments therefor reasonably satisfactory in form and content to Landlord (X) updating the same without any additional exception except such as may be reasonably permitted by Landlord and (Y) adding to its coverage any land acquired or leased in connection with such Capital Addition and increasing the coverage thereof by an amount equal to the Fair Market Value of the Capital Addition (except to the extent covered by the owner's policy of title insurance referred to in subparagraph (vi) below);

(vi)        following the advance of funds, if appropriate, (X) an extended coverage owner's policy of title insurance insuring fee simple title to any land conveyed to Landlord pursuant to subparagraph (iv), free and clear of all liens and encumbrances except those approved by Landlord, and (Y) a lender's policy of title insurance reasonably satisfactory in form and substance to Landlord and to any Lender with whom Landlord has agreed or may agree to provide financing; and

(vii)        during or following the advancement of funds, prints of architectural and engineering drawings relating to the Capital Addition and such other certificates (including, but not limited to, endorsements increasing the insurance coverage, if any, at the time required by Section 14.1), documents, opinions of counsel, appraisals, surveys, certified copies of duly adopted resolutions of the board of directors of Tenant authorizing the execution and delivery of the lease amendment and any other instruments as may be reasonably required by Landlord and any lender from whom Landlord has agreed or may agree to obtain financing.

(c)        Any new mortgage or supplement to any existing mortgage entered into by Landlord with any lending institution covering the Property or any land referred to in subparagraph (iv) above shall be subject to the rights of Tenant under this Lease, as this Lease may be amended from time to time.

11.3  **Capital Additions Paid for by Tenant.**  If Landlord does not finance the cost of a Capital Addition under the terms of Section 11.2 and Tenant elects nevertheless to make such Capital Addition, Tenant shall pay the cost of such Capital Addition, and there shall be no adjustment in the Base Rent by reason of any such Capital Addition.

11.4  **Disposition of Capital Additions upon Expiration or Termination of Lease.**  Upon the expiration or earlier termination of this Lease, all Capital Additions shall pass to and become the property of Landlord, free and clear of all encumbrances.

11.5  **Non-Capital Additions.** Tenant shall have the right to make additions, modifications or improvements to the Property which are not Capital Additions from time to time as it, in its reasonable discretion, may deem to be desirable for the Property's uses and purposes permitted hereunder, provided that such action shall not significantly alter the character or purpose or detract in any manner from the value or operating efficiency of the Property nor significantly impair the revenue-producing capability of the Property or materially and adversely affect the ability of Tenant to comply with the provisions of this Lease and that Tenant give Landlord ten days prior written notice of such addition, modification or improvement the cost of which exceeds $100,000, which are not Capital Additions.  The cost of such non-capital additions, modifications or improvements to the Property shall be paid by Tenant, and all such non-capital additions, modifications and improvements shall, without payment by Landlord at any time, be included under the terms of this Lease, and upon expiration or earlier termination of this Lease shall pass to and become the property of Landlord.

11.6  **Salvage.**  All materials which are scrapped or removed in connection with the making of either Capital Additions permitted by Section 11.1, non-capital additions permitted by Section 11.5, or repairs required by Article X shall be or become the property of the party which paid for, or provided the financing for, such work.

### ARTICLE XII
### LIENS

Subject to the provisions of Article XIII relating to permitted contests, Tenant shall not directly or indirectly create or allow to remain and shall promptly discharge at its expense any lien, encumbrance, attachment, title retention agreement or claim upon the Property or any attachment, levy,

-32-

claim or encumbrance in respect of Rent, not including, however,
(a) this Lease, (b) Permitted Encumbrances, (c) restrictions,
liens and other encumbrances which are consented to in writing by
Landlord, (d) liens for those taxes of Landlord which Tenant is
not required to pay hereunder, (e) subleases permitted by Article
XXIII, (f) liens for Impositions or for sums resulting from non-
compliance with Legal Requirements so long as the same are not
yet payable or are payable without the addition of any fine or
penalty and are in the process of being contested as permitted by
Article XIII, (g) liens of mechanics, laborers, materialmen,
suppliers or vendors for sums either disputed or not yet due,
provided that (i) the payment of such sums shall not be postponed
for more than five days after the completion of the action giving
rise to such lien and such reserve or other appropriate pro-
visions as shall be required by law or generally accepted
accounting principles shall have been made therefor or (ii) any
such liens are in the process  of being contested as permitted by
Article XIII, and (h) any liens which are the responsibility of
Landlord pursuant to the provisions of Article XXVI.


ARTICLE XIII
CONTESTS

        Tenant, on its own or on Landlord's behalf (or in Landlord's
name), but at Tenant's sole cost and expense, may contest, in
appropriate legal proceedings conducted in good faith and with
due diligence, the amount, validity or application, in whole or
in part, of any Imposition, Legal Requirement, Insurance Require-
ment, lien, attachment, levy, Encumbrance, charge or claim not
otherwise permitted by Article XII, provided that (a) in the case
of an unpaid Imposition, lien, attachment, levy, encumbrance,
charge or claim, the commencement and continuation of such pro-
ceedings shall suspend the collection thereof from Landlord and
from the Property, (b) neither the Property nor any Rent there-
from nor any part thereof or interest therein would be subject to
any risk of being sold, forfeited, attached, foreclosed, or lost,
(c) in the case of a Legal Requirement, Landlord would not be in
any danger of civil or criminal liability for failure to comply
therewith pending the outcome of such proceedings, (d) in the
event that any such contest shall involve a sum of money or
potential loss in excess of $50,000 then, in any such event,
Tenant shall deliver to Landlord an Officer's Certificate and
opinion of counsel to the effect set forth in clauses (a), (b)
and (c), to the extent applicable, (e) in the case of a Legal
Requirement or an Imposition, lien, encumbrance or charge, Tenant
shall give such reasonable security as may be demanded by
Landlord to insure ultimate payment of the same and to prevent
any sale or forfeiture of the affected portion of the Property or

the Rent by reason of such non-payment or non-compliance including without limitation a guaranty in form and substance acceptable to Landlord and executed by a guarantor acceptable to Landlord; provided, however, the provisions of this Article shall not be construed to permit Tenant to contest the payment of Rent (except as to contests concerning the method of computation or the basis of levy of any Imposition) or any other sums payable by Tenant to Landlord hereunder, (f) in the case of an Insurance Requirement, the coverage required by Article XIV shall be maintained, and (g) if such contest be finally resolved against Landlord or Tenant, Tenant shall, as Additional Charges due hereunder, promptly pay the amount required to be paid, together with all interest and penalties accrued thereon, or comply with the applicable Legal Requirement or Insurance Requirement. Landlord, at Tenant's expense, shall execute and deliver to Tenant such authorizations and other documents as may reasonably be required in any such contest and, if reasonably requested by Tenant or if Landlord so desires, Landlord shall join as a party therein.  Tenant shall indemnify and save Landlord harmless against any liability, cost or expense of any kind that may be imposed upon Landlord in connection with any such contest and any loss resulting therefrom.

### ARTICLE XIV
### INSURANCE

14.1  General Insurance Requirements.  Tenant shall at all times maintain policies of insurance insuring the Property, and all property located in or on the Property, against the kinds of risks and in the amounts of coverage described below.  All such insurance shall be written by companies of recognized responsibility authorized to conduct an insurance business in the State. All such insurance (other than insurance with respect to Tenant's Personal Property) shall name Landlord as an additional insured. Proceeds of insurance policies payable to Landlord or Tenant to compensate any loss shall be payable to Landlord or Tenant as provided in Article XV. All such insurance shall name as an additional insured or loss payee, as appropriate, the holder (a "Facility Mortgagee") of any mortgage, deed of trust or other security agreement securing any Encumbrance placed on the Property in accordance with the provisions of Article XXVI ("Facility Mortgages") by way of a standard form of mortgagee's loss payable endorsement.  Any loss adjustment or other settlement in excess of $100,000 shall require the written consent of Landlord and each Facility Mortgagee and any other lender of Landlord or its Affiliates ("Landlord Lender") having any contractual insurance requirements which would impact on the insurance requirements of this Lease to the extent so required and Landlord has given Tenant notice thereof.  Originals

or certified copies of all insurance policies obtained pursuant to this Article shall be deposited with Landlord and, if requested, with any Facility Mortgagee(s) or Landlord Lender(s). The policies on the Property, including the Improvements, Fixtures and Tenant's Personal Property, shall insure against the following risks:

(a)     loss or damage by fire, vandalism and malicious mischief, extended coverage perils, and all physical loss perils insurance including but not limited to sprinkler leakage, in an amount not less than 100% of the then full replacement cost thereof (as defined below in Section 14.2) or such lesser amount as is approved by Landlord in writing which coverage shall include an "increased cost of construction" endorsement;

(b)     loss or damage by explosion of steam boilers, pressure vessels or similar apparatus, now or hereafter installed in the Facility in such amounts with respect to any one accident as may be reasonably requested by Landlord from time to time;

(c)     business interruption or loss of rental under a rental value insurance policy covering risk of loss during the lesser of the first 12 months of reconstruction or the actual reconstruction period necessitated by the occurrence of any of the hazards described in Sections 14.1(a) or 14.1(b), if and to the extent available and economically feasible, in an amount sufficient to prevent Landlord from becoming a co-insurer;

(d)     claims for personal injury or property damage under a policy of comprehensive general public liability insurance, in an amount not less than one million dollars per occurrence with respect to bodily injury and death and three million dollars with respect to property damage;

(e)     claims arising out of medical malpractice in an amount not less than one million dollars for each person and three million dollars for each occurrence;

(f)     flood (when the Property is located in whole or in part within an area designated by an appropriate agency or authority of the United States as a flood plain) and such other hazards and in such amounts as may be customary for comparable properties in the area and as may be available from insurance companies, insurance pools, or other appropriate companies authorized to do business in the State at rates which are economically practicable in relation to the risks covered; and

-35-

(g)     During any period during which any Capital Addition is under construction, course of construction insurance and all risks insurance in such amounts as Landlord shall reasonably require.

14.2  **Replacement Cost.**  The term "full replacement cost" as used herein shall mean the actual replacement cost of the Property requiring replacement from time to time, less exclusions provided in a normal fire insurance policy.  If either party believes that full replacement cost (the then replacement cost less such exclusions) has increased or decreased at any time during the Lease Term, it may have such full replacement cost redetermined by the insurer then providing the largest amount of fire insurance coverage carried on the Property.

14.3  **Additional Insurance.**  In addition to the insurance described in Section 14.1, throughout the Term Tenant shall maintain such additional insurance as may be required from time to time by Landlord provided that the types and amounts of any such additional insurance required by Landlord is then customarily maintained by the operators of similar health care facilities in the region in which the Facility is located.  Tenant shall further maintain adequate workers' compensation insurance coverage for all persons employed by Tenant on the Property.  Such workers' compensation insurance shall be in accordance with the requirements of applicable local, state and federal law.

14.4  **Waiver of Subrogation.**  All insurance policies carried by Landlord or Tenant covering the Property, the Fixtures, the Facility or Tenant's Personal Property shall expressly waive any right of subrogation on the part of the insurer against the other party.  Landlord and Tenant agree that the respective policies of insurance carried by them will include such waiver clauses or endorsements so long as the same are obtainable without extra cost.  If such clauses and endorsements are only available upon the payment of an extra charge, the other party, at its election, may pay the same, but shall not be obligated to do so; provided that the Tenant shall at all times be obligated to carry the policies of insurance required under this Article regardless of whether the waiver of subrogation required under this Section 14.4 is available.

14.5  **Form of Insurance.**  All of the policies of insurance referred to in this Article shall be written in a form, and issued by insurance companies, satisfactory to Landlord.  Landlord agrees that it will not unreasonably withhold or delay its approval as to the form of the policies or the insurance companies selected by Tenant.  Tenant shall pay all of the premiums therefor, and shall deliver an original or certified copy of any

-36-

olicy, or renewal thereof, to Landlord, any Facility Mortgagee and any Landlord Lender at least 10 days prior to the expiration of the existing policy to which such renewal policy relates. If Tenant either fails to effect such insurance as herein required or to pay the premiums therefor, or to deliver such policies or certified copies thereof to Landlord at the times required, Landlord shall be entitled, but shall have no obligation, to effect such insurance and pay the premiums therefor, which premiums shall be repayable to Landlord upon demand therefor in a Notice, and failure by Tenant to repay the same shall constitute an Event of Default within the meaning of Section 17.1(b). Each insurer mentioned in this Article shall agree, by endorsement on the policy or policies issued by it, or by independent instrument furnished to Landlord, that it will give to Landlord (and to any Facility Mortgagee and Landlord Lender of which Tenant has notice, if required) 30 days' prior written notice before such policy or policies expire, are altered or are cancelled.

14.6  **Change in Limits.**  If either party shall at any time deem the limits of the personal injury or property damage public liability insurance or malpractice insurance then carried by Tenant to be insufficient or excessive, the parties shall endeavor in good faith to agree promptly upon the proper and reasonable limits for such insurance to be carried, and such insurance shall thereafter be carried with the limits thus agreed upon until further change pursuant to the provisions of this Section.

14.7  **Blanket Policy.**  Notwithstanding anything to the contrary contained in this Article, Tenant's obligations to carry the insurance provided for herein may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Tenant so long as (a) the coverage afforded to Landlord is not reduced or diminished or otherwise altered from that which would exist under a separate policy meeting all other requirements of this Lease by reason of the use of such blanket policy of insurance and (b) the requirements of this Article are otherwise satisfied.

14.8  **No Separate Insurance.**  Tenant shall not obtain separate insurance concurrent in form or contributing in the event of loss with that required in this Article XIV to be furnished by, or which may reasonably be required to be furnished by Tenant, nor shall Tenant increase the amount of any then existing insurance by securing an additional policy or additional policies, unless all parties having an insurable interest in the subject matter of the insurance, including in all cases Landlord and all Facility Mortgagees, are named therein as additional insureds, and the loss is payable under said insurance in the same manner as losses are payable under this Lease. Tenant shall

immediately notify Landlord of the obtaining of any such separate insurance or of the increasing of any of the amounts of the then existing insurance.

## ARTICLE XV
### INSURANCE PROCEEDS

15.1  **Handling of Insurance Proceeds.**  All proceeds from any policy of insurance required by Article XIV of this Lease shall be paid to Landlord and held in trust by Landlord (subject to the provisions of Section 15.7) and shall be made available for reconstruction or repair, as the case may be, of any damage to or destruction of all or any portion of the Property to which such proceeds relate, and shall be paid out by Landlord from time to time subject to the provisions hereof for the cost of such reconstruction or repair.  Any unused portion shall be retained by Landlord free and clear upon completion of such repair and restoration.  If neither Landlord nor Tenant is required or elects to repair and restore, and the Lease is terminated without purchase by Tenant as described in Section 15.2(a), then all such insurance proceeds shall be retained by Landlord.  All salvage resulting from any risk covered by insurance shall belong to Landlord, except that any salvage relating to Tenant's Personal Property shall be the property of Tenant.

15.2  **Reconstruction in the Event of Damage or Destruction Covered by Insurance.**

(a)  Except as provided in Section 15.7, if during the Term the Property is totally or substantially destroyed by a risk covered by the insurance described in Article XIV so that the Facility thereby is rendered unsuitable for its Primary Intended Use (taking into account all relevant factors, including but not limited to the number of useable beds, the amount of square footage reasonably available for use by Tenant and the type and amount of Gross Revenues lost), Tenant shall at its option either (i) restore the Facility to substantially the same condition as existed immediately before the damage or destruction or (ii) acquire the Property from Landlord for a purchase price equal to the greater of the Minimum Repurchase Price or the Fair Market Value Purchase Price of the Property immediately prior to such damage or destruction, or (iii) terminate the Lease with respect to the Property effective upon Landlord's receipt of the insurance proceeds and any "Shortfall" (as hereinafter defined) and in such event Landlord shall be entitled to retain or collect for its own benefit the insurance proceeds, provided that, in the event the amount of the insurance proceeds received by Landlord are less than the amounts which would be payable in the aggregate

-38-

under the insurance policies specified in Section 14.1(a) such termination shall not be effective until Tenant pays Landlord the amount of such shortfall ("Shortfall") in cash.  If Tenant restores the Facility, the insurance proceeds shall be paid out by Landlord to Tenant or its designee from time to time as necessary to pay for the reasonable costs of such restoration.  If Tenant acquires the Property, all applicable insurance proceeds shall be the property of Tenant.

      (b)      Except as provided in Section 15.7, if during the Term the Improvements or the Fixtures are totally or partially destroyed from a risk covered by the insurance described in Article XIV but the Facility is not thereby rendered unsuitable for the Primary Intended Use (taking into account all relevant factors, including but not limited to the number of useable beds, the amount of square footage reasonably available for use by Tenant and the type and amount of Gross Revenues lost), Tenant shall restore the Facility to substantially the same condition as existed immediately before the damage or destruction.  Such damage or destruction shall not terminate this Lease; provided, however, that if Tenant cannot, with reasonable diligence and within a reasonable time, obtain all government approvals, including building permits, licenses, conditional use permits and any certificates of need, necessary to perform all required repair and restoration work and to operate the Facility in substantially the same manner and for the Primary Intended Use, Tenant shall either (i) offer to purchase the Property for a purchase price equal to the greater of the Minimum Repurchase Price or the Fair Market Value Purchase Price immediately prior to such damage or destruction or (ii) continue with the Lease in full force and effect in which event Landlord shall be entitled to retain the insurance proceeds, less the amount needed to restore the Property so that the portion of the Facility unaffected by the casualty can be used as a complete architectural unit.  If Tenant shall make such offer and Landlord does not accept the same within 120 days of Landlord's receipt of such offer, Tenant may either (X) withdraw such offer, in which case this Lease shall remain in full force and effect and Tenant shall proceed to restore the Facility as soon as reasonably practicable to substantially the same condition as existed immediately before such damage or destruction, or (Y) terminate this Lease after recovery by Landlord of all insurance proceeds and the payment by Tenant of any Shortfall in cash.  If Tenant so restores the Facility, insurance proceeds shall be paid out by Landlord from time to time to pay for the reasonable costs of such restoration, and any excess proceeds remaining after such restoration shall be retained by Landlord.

      (c)      If Tenant elects to repair or restore any damage or destruction to the Property and the cost of any such

-39-

repair or restoration exceeds the amount of proceeds received by Landlord from the insurance required under Article XIV, Tenant shall contribute any and all excess amounts necessary to repair or restore the Facility. Tenant shall provide Landlord with a payment or completion guaranty in form and substance reasonably acceptable to Landlord; provided that CMS shall be an acceptable guarantor, without any additional security if, at such time, its financial condition, in the sole opinion of Landlord, is no worse than its financial condition at the time of the execution of this Lease, or if no acceptable guarantor is available, Tenant shall pay Landlord the amount of such difference which amount shall be held in trust, together with any other insurance proceeds, for application to the cost of repair and restoration as such repair and restoration progresses.

(d)     If Landlord accepts Tenant's offer to purchase the Property this Lease shall terminate as to the Property upon payment of the purchase price therefor and Landlord shall thereupon remit to Tenant all insurance proceeds pertaining to the Property less Landlord's expenses, including attorneys' fees, and assign Landlord's rights in any uncollected insurance proceeds to Tenant.

15.3    Reconstruction in the Event of Damage or Destruction Not Covered by Insurance.  Except as provided in Section 15.7 below, if during the Term the Facility is totally destroyed or materially damaged (i) from a risk not covered by insurance described in Article XIV but that would have been covered if Tenant carried the insurance customarily maintained by, and generally available to, the operators of reputable health care facilities in the region in which the Facility is located, (ii) from a risk for which insurance coverage is voided due to any act or omission by Tenant, or (iii) as result of an earthquake, whether or not such damage or destruction renders the Facility unsuitable for its Primary Intended Use (taking into account all relevant factors, including but not limited to the number of useable beds, the amount of square footage reasonably available for use by Tenant and the type and amount of Gross Revenues lost), Tenant shall restore the Facility to substantially the same condition as existed immediately before such damage or destruction and not terminate this Lease.  Otherwise, if the Facility is totally destroyed or materially damaged by a risk not covered by insurance such that the Facility shall be unusable for its Primary Intended Use, this Lease shall terminate within 90 days of such destruction or damage, provided that the Tenant may elect to restore the Facility, in which event, this Lease shall continue in full force and effect.  If such damage or destruction does not render the Facility unusable for its Primary Intended Use, Tenant shall also restore the Facility to substantially the

same condition as existed immediately before the damage or
destruction.

15.4   **Payment of Proceeds on Tenant's Property and Capital
Additions Paid by Tenant.**   All insurance proceeds payable by
reason of any loss of or damage to any of Tenant's Personal
Property or Capital Additions paid for by Tenant shall be paid to
Tenant and Tenant shall hold such insurance in trust to pay the
cost of repairing or replacing damaged Tenant's Personal Property
or Capital Additions paid for by Tenant provided, however, that
if the damaged Tenant's Personal Property or Capital Additions
paid for by Tenant were no longer useful to Tenant's operations
prior to their destruction, Tenant shall not be obligated to
repair or replace them.

15.5   **Restoration of Tenant's Property.**   Upon any restora-
tion of the Facility as provided in Section 15.2 or 15.3, Tenant
shall either (i) at Tenant's sole cost and expense, restore all
alterations and improvements made by Tenant, Tenant's Personal
Property and all Capital Additions paid for by Tenant, or (ii) at
Tenant's sole cost and expense, replace such alterations and
improvements, Tenant's Personal Property or Capital Additions
with improvements or items of the same or better quality and
utility in the operation of the Property.

15.6   **Abatement of Rent.**   This Lease shall remain in full
force and effect and Tenant's obligation to make rental payments
and to pay all other charges required by this Lease shall remain
unabated except payments of Base Rent shall be abated as provided
in Section 6.2.

15.7   **Damage Near End of Term.**   Notwithstanding any pro-
visions of Section 15.2 or 15.3 to the contrary, if damage to or
destruction of the Facility occurs during the last 12 months of
the then applicable term (whether Fixed or Extended), if Tenant
has not elected to extend such term, and if such damage or
destruction cannot be fully repaired and restored within six
months immediately following the date of loss, then Tenant shall
have the right to terminate this Lease by giving written Notice
thereof to Landlord within 30 days after the date of such damage
or destruction, in which event, Landlord shall collect any
insurance proceeds to which it is entitled, and Tenant shall
assign Tenant's rights in any additional insurance proceeds.   In
the event that the Facility is totally destroyed or damaged (i)
from a risk not covered by insurance described in Article XIV but
that would have been covered if Tenant carried the insurance
customarily maintained by, and generally available to, the
operators of reputable health care facilities in the region in
which the Facility is located, (ii) from a risk for which
insurance coverage is voided due to any act or omission by

hant, or (iii) as result of an earthquake, whether or not such damage or destruction renders the Facility unsuitable for its Primary Intended Use (taking into account all relevant factors, including but not limited to the number of useable beds, the amount of square footage reasonably available for use by Tenant and the type and amount of Gross Revenues lost), then Tenant shall pay to Landlord a sum equal to the amount reasonably necessary to repair such damage or destruction.

15.8 **Termination of Option to Purchase.** Any termination of this Lease pursuant to this Article shall cause the option to purchase granted to Tenant under Section 25.4 and the right to extend the Term by any Extended Term to be terminated and to be without further force or effect.

15.9 **Waiver.** Tenant hereby waives any statutory rights of termination which may arise by reason of any damage or destruction of the Facility which Landlord is obligated to restore or may restore under any of the provisions of this Lease.

## ARTICLE XVI
### CONDEMNATION

16.1 **Definitions.**

(a)    "Condemnation" means (a) the exercise of any governmental power, whether by legal proceedings or otherwise, by a Condemnor, or (b) a voluntary sale or transfer by Landlord with Tenant's consent (provided no Event of Default has occurred and is continuing at such time) to any Condemnor, either under threat of condemnation or while legal proceedings for condemnation are pending.

(b)    "Date of Taking" means the first date the Condemnor has the right to immediate possession of the property being condemned.

(c)    "Award" means all compensation, sums and any other value awarded, paid or received on a total or partial condemnation.

(d)    "Condemnor" means any public or quasi-public authority, or private corporation or individual, having the power of condemnation.

16.2 **Parties' Rights and Obligations.** If during the Term there is any Taking of all or any part of the Property or of any

-42-

interest in this Lease by Condemnation, the rights and obligations of the parties shall be determined by this Article.

16.3  **Total Taking.**  If title to the fee of the whole of the Property shall be taken or condemned by any Condemnor, this Lease shall cease and terminate as of the Date of Taking.  If title to the fee of less than the whole of the Property shall be so taken or condemned, which nevertheless renders the Property unsuitable for its Primary Intended Use (taking into account all relevant factors, including but not limited to the number of useable beds, the amount of square footage reasonably available for use by Tenant, and the type and amount of Gross Revenues lost), Tenant and Landlord each shall have the option by Notice to the other, at any time prior to the taking of possession by, or the date of vesting of title in, such Condemnor, whichever first occurs, to terminate this Lease as of such earlier to occur date.  Upon such earlier to occur date, if such Notice has been given, this Lease shall cease and terminate.  In either of such events, all Rent paid or payable by Tenant hereunder shall be apportioned as of the date the Lease shall have been so terminated as aforesaid.

16.4  **Allocation of Portion of Award.**  Subject to the rights of any Facility Mortgagee, the total Condemnation Award made with respect to all or any portion of the Property shall be distributed to Landlord and Tenant ratably in accordance with the value of their respective interests in and to such Property as hereafter set forth in this Section 16.4.  All of the Award shall be the sole and exclusive property of Landlord and shall be payable to Landlord, subject to the rights of any Facility Mortgagee; provided that any portion of such Condemnation Award which is expressly allocated by the Condemnor to the taking of Tenant's leasehold interest in the Property, the taking of any Capital Additions (or any portion thereof) paid for by Tenant, any loss of business by Tenant during the remaining Term of this Lease, the taking of Tenant's Personal Property, or any removal and relocation expenses of Tenant in any such proceedings shall be the sole property of and payable to Tenant.  In any Condemnation proceedings Landlord and Tenant each shall seek their own Award in conformity herewith, at their own expense.

16.5  **Partial Taking.**  If title to the fee of less than the whole of the Property shall be taken or condemned, and the Property is still suitable for its then existing use, or if Tenant or Landlord shall be entitled (but shall not elect) to terminate this Lease as provided in Section 16.3 hereof, Tenant at its own cost and expense shall with all reasonable diligence restore the untaken portion of any Improvements on the Property so that such Improvements shall constitute a complete architectural unit of the same general character and condition (as nearly as may be possible under the circumstances) as the Improvements

-43-

existing immediately prior to such Condemnation or Taking.   Land-
lord and Tenant shall each contribute to the cost of restoration
that part of their Award specifically allocated to such restora-
tion, if any (or if no such specific allocation is made, a just,
fair and reasonable portion of its Award as reasonably determined
by Landlord and Tenant or by arbitration in accordance with
Section 28.14 if Landlord and Tenant are unable to agree within
30 days of the Award), together with any and all severance and
other damages awarded for any taken Improvements; provided,
however, the amount of such contribution shall not exceed such
cost.   If such amounts are not sufficient to cover the cost of
restoration Landlord and Tenant shall contribute any additional
amounts needed for restoration in proportion to the amounts
already contributed by them, provided that in no event shall
Landlord contribute any amount to such restoration in excess of
its Award.   Thereafter, any excess restoration cost shall be
borne solely by Tenant.   The Base Rent shall be reduced as set
forth in Section 6.2.

     16.6   Temporary Taking.   If the whole or any part of the
Property or of Tenant's interest under this Lease shall be taken
or condemned by any Condemnor for its temporary use or occupancy,
this Lease shall not terminate, and Tenant shall continue to pay,
in the manner and at the times herein specified, the full amounts
of Base Rent, Percentage Rent and Additional Rent, if any, and
Additional Charges, provided that during any such Temporary
Taking Tenant shall pay Percentage Rent and Additional Rent at a
rate equal to the average Percentage Rent and Additional Rent
during the three immediately preceding Fiscal Years (or if three
Fiscal Years shall not have elapsed, the average during the last
preceding Fiscal Years occurring during the Term).   Except to the
extent Tenant may be prevented from so doing pursuant to the
terms of the order of the Condemnor, Tenant shall continue to
perform and observe all of the other terms, covenants, conditions
and obligations hereof on the part of the Tenant to be performed
and observed as though such Taking or Condemnation had not
occurred.   Upon any such Taking or Condemnation described in this
Section, the entire amount of any such Award made for such Taking
or Condemnation allocable to the Term of this Lease, whether paid
by way of damages, Rent or otherwise, shall be paid to Tenant.
Tenant covenants that upon the termination of any such period of
temporary use or occupancy as set forth in this Section Tenant
will, at its sole cost and expense (subject to any contribution
by Landlord as set forth in Section 16.5), restore the Property
as nearly as may be reasonably possible to the condition in which
the same was immediately prior to such Taking or Condemnation,
unless such period of temporary use or occupancy shall extend
beyond the expiration of the Term, in which case Tenant shall not
be required to make such restoration.

## ARTICLE XVII
## DEFAULTS AND REMEDIES

17.1  **Events of Default.**  Any one or more of the following events shall be deemed an "Event of Default" hereunder:

(a)     Tenant shall fail to pay Rent payable by Tenant under this Lease when the same becomes due and payable and such failure is not cured by Tenant within a period of seven days after Notice thereof from Landlord;

(b)     Tenant shall fail to observe or perform any other material term, covenant or condition of this Lease and such failure is not cured by Tenant within a period of 30 days after Notice thereof from Landlord, unless such failure cannot with due diligence be cured within a period of 30 days, in which case such failure shall not be deemed to continue if Tenant proceeds promptly and with due diligence to cure the failure and diligently completes the curing thereof;

(c)     Tenant or CMS shall (i) admit in writing its inability to pay its debts generally as they become due, (ii) file a petition in bankruptcy or a petition to take advantage of any insolvency law, (iii) make a general assignment for the benefit of its creditors, (iv) consent to the appointment of a receiver of itself or of the whole or any substantial part of its property, or (v) file a petition or answer seeking reorganization or arrangement under the Federal bankruptcy laws or any other applicable law or statute of the United States of America or any State thereof;

(d)     Tenant or CMS shall, on a petition in bankruptcy filed against either of them, be adjudicated bankrupt or have an order for relief thereunder entered against it or a court of competent jurisdiction shall enter an order or decree appointing, without the consent of Tenant or CMS, a receiver of Tenant or CMS or of the whole or substantially all of its property, or approving a petition filed against Tenant or CMS seeking reorganization or arrangement of Tenant or CMS under the federal bankruptcy laws or any other applicable law or statute of the United States of America or any state thereof, and such judgment, order or decree shall not be vacated or set aside or stayed within 90 days from the date of the entry thereof;

(e)     Tenant or CMS shall be liquidated or dissolved, or shall begin proceedings toward such liquidation or dissolution, or shall, in any manner, permit the sale or divestiture of substantially all of its assets other than in

-45-

connection with a merger or consolidation of Tenant or CMS into, or a sale of substantially all of Tenant's or CMS's assets to, another corporation, provided that the survivor of such merger or the purchaser of such assets shall assume all of Tenant's obligations under this Lease by a written instrument, in form and substance reasonably satisfactory to Landlord, accompanied by an opinion of counsel, reasonably satisfactory to Landlord and addressed to Landlord stating that such instrument of assumption is valid, binding and enforceable against the parties thereto in accordance with its terms (subject to usual bankruptcy and other creditors' rights exceptions), and provided further, that, immediately after giving effect to any such merger, consolidation or sale, Tenant or the other corporation (if not Tenant) surviving the same, shall have a Consolidated Net Worth of not less than the Consolidated Net Worth of Tenant immediately prior to such merger, consolidation or sale, all as to be set forth in an Officer's Certificate and delivered to Landlord within a reasonable period of time after such merger, consolidation or sale;

(f)    the estate or interest of Tenant in the Property or any part thereof shall be levied upon or attached in any proceeding and the same shall not be vacated or discharged within the later of 60 days after commencement thereof or 30 days after Notice thereof from Landlord (unless Tenant shall be contesting such lien or attachment in good faith in accordance with Article XIII hereof);

(g)    except as a result of damage, destruction or a partial, temporary or complete Condemnation, Tenant voluntarily ceases operations on the Property for a period in excess of 180 days; or

(h)    any of the representations or warranties made by CMS in the Guaranty proves to be untrue when made in any material respect.

No Event of Default (other than a failure to make a payment of money) shall be deemed to exist under clause (b) above during any time the curing thereof is prevented by an Unavoidable Delay, provided that upon the cessation of such Unavoidable Delay, Tenant immediately shall remedy such default.

Any of the events referred to in subsections 17.1(c), (d) or (e) relating to CMS shall not constitute an Event of Default hereunder if, within fifteen (15) days of such event, or of any violation of any covenant, condition, or other provision under the Guaranty, Tenant shall deliver to Landlord a letter of credit ("Letter of Credit") in a sum equal to the aggregate Rent payable over the 12-month period immediately preceding the end of the most recently completed Fiscal Year quarter.  Such Letter of

Credit shall (i) be irrevocable, (ii) have a term of at least one year, (iii) be drawable on sight accompanied by Landlord's written statement that an Event of Default specified herein has occurred and is continuing, and (iv) be from a bank and in a form acceptable to Landlord.  Tenant shall renew the Letter of Credit annually, and a failure to do so shall constitute an Event of Default under the terms of this Lease.  Failure to timely deliver the Letter of Credit shall constitute an immediate Event of Default.

Tenant shall immediately notify Landlord of the occurrence of any event set forth in subsections 17.1(b) through (h).

17.2  **Certain Remedies.**  Upon any Event of Default, Landlord shall have all legal, equitable and contractual rights, powers and remedies provided either in this Lease, at common law or in equity, or by statute or otherwise.  Without limiting the foregoing, if an Event of Default occurs, is not cured within the period, if any, for any such cure provided in Section 17.1, and is continuing, whether or not this Lease has been terminated, Tenant shall, to the extent permitted by law and if required by Landlord so to do, immediately surrender to Landlord the Property and quit the same.  Landlord may enter upon and repossess the Property by reasonable force, summary proceedings, ejectment or otherwise, and may remove Tenant and all other persons and any and all personal property from the Property subject to rights of any residents or patients and to any requirement of law.  No such entry or repossession by Landlord shall be deemed an election by Landlord to terminate this Lease unless specifically stated by Landlord in writing from Landlord to Tenant.  Thereafter Landlord shall use reasonable, good faith efforts to relet the Property or otherwise mitigate Landlord's damages.

17.3  **Damages.**  Upon the occurrence of any Event of Default, Landlord may terminate this Lease by giving Tenant not less than ten days' Notice of such termination during which time Tenant shall have the opportunity to cure any such Event of Default. Upon the expiration of the time fixed in such Notice, unless such Event of Default is cured, the Term shall terminate and all rights of Tenant under this Lease shall cease.  Landlord shall have all rights at law and in equity available to Landlord as a result of Tenant's breach of this Lease.  If any litigation is commenced with respect to any alleged default under this Lease, the prevailing party in such litigation shall receive, in addition to its damages incurred, its reasonable attorneys' fees, and all costs and expenses incurred in connection therewith.  Neither the termination of this Lease pursuant to this Section 17.3, the repossession of the Property, the failure of Landlord, notwithstanding reasonable good faith efforts, to relet the Property, nor the reletting of all or any portion of the Property, shall

relieve Tenant of its liability and obligations hereunder, all of which shall survive any such termination, repossession or reletting. Upon any such termination, Tenant shall forthwith pay to Landlord all Rent due and payable with respect to the Property to and including the date of such termination.  Thereafter Tenant shall promptly pay to Landlord, at Landlord's option, either:

(a)   without termination of Tenant's right to possession of the Property, each installment of said Rent and other sums payable by Tenant to Landlord under the Lease as the same becomes due and payable, which Rent and other sums shall bear interest at the lesser of the Overdue Rate or the maximum rate of interest permitted by applicable law from the date when due until paid, and Landlord may enforce, by action or otherwise, any other term or covenant of this Lease; or

(b)   the sum of (i) the worth at the time of the award, of the unpaid Rent earned at the time of such termination, repossession or reletting, (ii) the worth at the time of the award, of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided, (iii) the worth at the time of the award of the amount by which the unpaid Rent for the balance of the Term after the time of the award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided, and (iv) any other amount necessary to compensate Landlord for the costs incurred in regaining possession and reletting the Property, including but not limited to brokerage fees and commissions, construction costs, rent concessions, and all legal costs and expenses.

The "worth at the time of the award" of the amounts referred to in subparagraphs (i) and (ii) above shall be computed by allowing interest at the Overdue Rate.  The "worth at the time of the award" of the amount referred to in subparagraph (iii) shall be determined by a Court having jurisdiction thereof using the lowest rate of capitalization (highest present worth) reasonably applicable at the time of such determination and allowed by applicable law.

Percentage Rent and Additional Rent, for the purposes of this Section 17.3, shall be a sum equal to the average of the annual amounts of the Percentage Rent and Additional Rent for the three Fiscal Years immediately preceding the Fiscal Year in which the termination, re-entry or repossession takes place, or if three Fiscal Years shall not have elapsed, the average of the Percentage Rent and Additional Rent during the last preceding Fiscal Years occurring during the Term.

**17.4  Application of Funds.**  Any payments normally made to Tenant hereunder which are made to and received by Landlord under any of the provisions of this Lease during the continuance of any Event of Default shall be applied to Tenant's obligations in the order which Landlord may determine or as may be prescribed by applicable laws.

**17.5  Failure to Conduct Business.**  For the purpose of determining rental loss damages, Percentage Rent, if Tenant fails to conduct business upon the Property, and thereby causes the exact damages or the amount of Percentage Rent to be unascertainable, Percentage Rent and Additional Rent for such period shall be deemed to be the average of the annual amounts of the Percentage Rent and Additional Rent during the three preceding Fiscal Years, or if three Fiscal Years shall not have elapsed, the average of the Percentage Rent and Additional Rent during the last preceding Fiscal Years occurring during the term.

**17.6  Landlord's Right to Cure Tenant's Default.**  If an Event of Default occurs under this Lease and is not cured within the time provided under this Lease with respect to such Event of Default, Landlord, without waiving or releasing any obligation of Tenant, and without waiving any such Event of Default, may (but shall be under no obligation to) at any time thereafter cure such default for the account and at the expense of Tenant, and may, to the extent permitted by law, enter upon the Property for such purpose and take all such action thereon as, in Landlord's sole judgment, may be necessary or appropriate with respect thereto. No such entry by Landlord on the Property shall be deemed an eviction of Tenant.  All sums so paid by Landlord and all costs and expenses (including, with out limitation, reasonable attorneys' fees and expenses, in each case to the extent permitted by law) so incurred, together with a late charge thereon (to the extent permitted by law) at the Overdue Rate from the date on which such sums or expenses are paid or incurred by Landlord until paid, shall be paid by Tenant to Landlord on demand.  The obligations of Tenant and rights of Landlord contained in this Article shall survive the expiration or earlier termination of this Lease.

**17.7  Waiver.**  If this Lease is terminated pursuant to the provisions of this Article, Tenant waives, to the extent permitted by applicable law, (a) any right of redemption, re-entry or repossession, (b) any right to trial by jury in the event of summary proceedings to enforce the remedies set forth in this Article, and (c) the benefit of any laws now or hereafter enforced exempting property from liability for rent or for debt.

## ARTICLE XVIII
### CURE BY TENANT OF LANDLORD DEFAULTS

Landlord shall be in default of its obligations under this Lease if Landlord shall fail to observe or perform any term, covenant or condition of this Lease on its part to be performed, and such failure shall continue for a period of 30 days after notice thereof from Tenant (or such shorter time as may be necessary in order to protect the health or welfare of any patient or other resident of the Property), unless such failure cannot be cured with due diligence within a period of 30 days, in which case such failure shall not be deemed to continue if Landlord, within said 30 day period, proceeds promptly and with due diligence to cure the failure and diligently completes the curing thereof. The time within which Landlord shall be obligated to cure any such failure shall also be subject to extension of time due to the occurrence of any Unavoidable Delay. If Landlord fails to commence such cure as provided herein, Tenant may cure such default, and so long as Tenant continues to pay Rent, Tenant shall have the right by separate and independent action to pursue any claim it may have against Landlord for Landlord's failure to cure such default.

## ARTICLE XIX
### PURCHASE OF PROPERTY BY TENANT

19.1  **Unsolicited Offers.** If Landlord receives an unsolicited offer from a third party to purchase the Property, which offer is acceptable to Landlord and no Event of Default has occurred and is continuing, Landlord shall give written notice ("Notice") to tenant specifying all of the terms and conditions of such offer. Tenant shall have 20 days from receipt of the Notice to elect to purchase the Property on the terms and conditions in the Notice by delivering written notice of such election to Landlord. The right granted to Tenant under this Section 19.1 is also hereby granted to, and may be exercised within the foregoing 20 day period by, Washington Regional Outreach Services, an Arkansas non-profit corporation ("Washington") or by CMS Fayetteville Rehabilitation, Inc., and Arkansas corporation ("CMS Fayetteville"); provided, however, that if both Washington and one or more of CMS Fayetteville and Tenant attempt to exercise the foregoing right granted under this Section 19.1, then such right shall vest solely in Washington and neither Tenant nor CMS Fayetteville will have any further right to purchase the Property under this Section 19.1; provided, further, that if both Tenant and CMS Fayetteville (but not Washington) attempt to execute the foregoing right, such right shall vest solely in Tenant and CMS Fayetteville shall have no right or option to purchase the Property pursuant to this Section 19.1.

19.2  **Landlord's Right to Sell.**  If Landlord desires to sell the Property at any time during the term, Landlord shall give written notice ("Notice") to Tenant of such desire, and the terms and conditions upon which Landlord is willing to sell the Property.  Tenant shall have 20 days from receipt of the Notice to elect to purchase the Property on the terms and conditions set forth in the Notice or such other terms and conditions as Landlord and Tenant shall agree to.  If Tenant does not elect to purchase the Property on the terms in the Notice and Landlord and Tenant are otherwise unable to agree on other terms and conditions, Landlord shall be free to sell to any third party on substantially the same terms offered to Tenant.  Thereafter the terms of this Section shall again apply.  The right granted to Tenant under this Section 19.2 is also hereby granted to, and may be exercised within the foregoing 20 day period by, Washington or by CMS Fayetteville; provided, however, that if both Washington and one or more of CMS Fayetteville and Tenant attempt to exercise the foregoing right granted under this Section 19.2, then such right shall vest solely in Washington and neither Tenant nor CMS Fayetteville will have any further right to purchase the Property under this Section 19.2; provided, further, that if both Tenant and CMS Fayetteville (but not Washington) attempt to execute the foregoing right, such right shall vest solely in Tenant and CMS Fayetteville shall have no right or option to purchase the Property pursuant to this Section 19.2.

19.3  **Purchase of the Property.**  If Tenant purchases the Property from Landlord pursuant to any of the terms of this Lease, Landlord shall, upon receipt from Tenant of the applicable purchase price, together with full payment of any unpaid Rent due and payable with respect to any period ending on or before the date of such purchase, deliver to Tenant an appropriate deed or other conveyance conveying the entire interest of Landlord in and to the Property to Tenant free and clear of all mortgages and encumbrances other than (a) those mortgages which Tenant has agreed in writing to accept and to take title subject to, (b) encumbrances imposed on the Property under Section 8.3 and (c) any other encumbrances permitted hereby to be imposed on the Property other than monetary liens created by Landlord.  The difference between the applicable purchase price and the total amount of the encumbrances assumed or taken subject to shall be paid in cash to Landlord or as Landlord may direct, in federal or other immediately available funds, unless otherwise mutually agreed by Landlord and Tenant.  All expenses of conveying the Property to Tenant, including, without limitation, the cost of title insurance and attorneys' fees incurred by Landlord in connection with such conveyance and release, and documentary transfer and similar taxes, shall be paid by Tenant.  Recording fees and expenses of its counsel shall also be paid by Tenant.

19.4  **Failure to Close Purchase.**  The closing of any such sale shall be contingent upon and subject to Tenant obtaining all required governmental consents and approvals for such transfer. If such sale shall fail to be consummated by reason of the inability of Tenant to obtain all such approvals and consents, then this Lease shall remain in effect on a month-to-month basis until the consummation of the purchase or until Tenant's inability to obtain the approvals and consents is confirmed.

## ARTICLE XX
### HOLDING OVER

If Tenant for any reason remains in possession of the Property after the expiration of the Term or earlier termination of the Term, such possession shall be a month-to-month tenancy during which time Tenant shall pay to Landlord as rental each month one and one half (1-1/2) times the aggregate of (i) one-twelfth of the aggregate Base Rent and Percentage Rent and Additional Rent payable with respect to the last Lease year of the Term just expired, (ii) all Additional Charges accruing during the month with respect to which such payment relates, and (iii) all other sums, if any, payable by Tenant pursuant to the provisions of this Lease with respect to the Property.  During such period of month-to-month tenancy, Tenant shall be obligated to perform and observe all of the terms, covenants and conditions of this Lease, but shall have no rights hereunder other than the right, to the extent given by law to month-to-month tenancies, to continue its occupancy and use of the Property.  Nothing contained herein shall constitute the consent, express or implied, of Landlord to the holding over of Tenant after the expiration or earlier termination of this Lease.

## ARTICLE XXI
### RISK OF LOSS

During the Term of this Lease, Tenant shall bear the risk of loss or of decrease in the enjoyment and beneficial use of the Property resulting from the damage or destruction thereof by fire, the elements, casualties, thefts, riots, wars or any other cause, or resulting from foreclosures, attachments, levies or executions (other than those caused by Landlord and those claiming from, through or under Landlord) and, in the absence of the gross negligence, willful misconduct or breach of this Lease by Landlord, Landlord shall in no event be responsible therefor nor shall any of the events mentioned in this Section entitle Tenant to any abatement of Rent except as specifically provided in this Lease.

-52-

ARTICLE XXII
LIABILITY OF PARTIES

22.1  Indemnification by Tenant.  Notwithstanding the existence of any insurance provided for in Article XIV, and notwithstanding the policy-limits of any such insurance, Tenant shall indemnify, defend, save and hold Landlord harmless from and against any and all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses  ("Claims") (including, without limitation, reasonable attorneys' fees and expenses), to the extent permitted by law, imposed upon, incurred by or asserted against Landlord arising out of, connected with or incidental to:

(a)  any Hazardous Substance located in, on or under the Property or the Improvements due to the act or omission of Tenant, including any improvements, repairs, handling, removal or other actions taken by Landlord in order to comply with all rules and regulations promulgated by any applicable federal, state, or local government rule and regulation with respect to any such Hazardous Substance or related problems that Landlord becomes aware of;

(b)  any accident, injury to or death of persons, or loss of or damage to property, occurring on or about the Property or adjoining sidewalks, alleys or roadways, including without limitation any claims of malpractice;

(c)  any past, present or future use, misuse, non-use, condition, management, maintenance or repair by Tenant of the Property or Tenant's Personal Property and any litigation, proceeding or claim by governmental entities or other third parties to which Landlord is made a party or other participant related to the Property or Tenant's Personal Property or such use, misuse, non-use, condition, management, maintenance or repair thereof, including but not limited to any failure to perform obligations (other than condemnation proceedings) to which Landlord is made a party;

(d)  any Impositions which are the obligations of Tenant to pay pursuant to the applicable provisions of this Lease;

(e)  any failure on the part of Tenant to perform or comply with any of the terms of this Lease; and

(f)    the non-performance of any of the terms and provisions of any and all existing and future subleases of the Property to be performed by Tenant thereunder.

Any amounts payable by Tenant under this Section shall be paid within ten days after Tenant's liability therefor is determined by litigation or otherwise.  If such amounts are not timely paid, they shall bear a late charge (to the extent permitted by law) at the Overdue Rate from the date of such determination to the date paid.  Tenant, at its expense, shall contest, resist and defend any such claim, action or proceeding asserted or instituted against Landlord, or may compromise or otherwise dispose of the same as Tenant sees fit.  Nothing herein shall be construed as indemnifying Landlord against its own sole or gross negligence or willful misconduct.

22.2  Indemnification by Landlord.  Landlord shall indemnify, defend, save and hold Tenant harmless from and against any and all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) imposed upon, incurred by or asserted against Tenant arising out of, connected with or incidental to the gross negligence or willful misconduct of Landlord; provided, however, that Tenant's right to indemnification as provided herein, shall be subject to the limitation set forth in Article XXVII.

22.3  Continuing Liability.  Tenant's and Landlord's liability for a breach of the provisions of this Article arising during the Term hereof shall survive any termination of this Lease.

## ARTICLE XXIII
## ASSIGNMENT AND SUBLETTING

23.1  Assignment and Subletting.  Subject to the provisions of Section 23.3 below and any other express conditions or limitations set forth in this Lease, Tenant may, without the consent of Landlord, (a) assign this Lease or sublet all or any part of the Property to an Affiliate of Tenant, or (b) sublet all or any part of the Property (i) in the normal course of the Primary Intended Use (such as but not limited to, hospital based physician uses and leasing of space for major movable equipment or functional departments such as physical therapy), and (ii) as to less than an aggregate of 25% of the rentable square footage of the Facility, to concessionaires or other third party users or operators of portions of the Property, provided that any subletting to any party other than an Affiliate of Tenant shall not indi-

vidually as to any one such subletting, or in the aggregate, materially diminish the actual or potential Percentage Rent and Additional Rent payable under this Lease. Except as otherwise permitted in the immediately preceding sentence, an assignment or subletting of all or any portion of the Property shall not be permitted unless the consent of Landlord is first obtained, which Landlord may withhold in its sole discretion. Landlord shall not unreasonably withhold its consent to any subletting or assignment, provided that the assignee or sublessee is creditworthy in the opinion of Landlord and (w) in the case of a subletting, the sublessee shall comply with the provisions of Section 23.2, (x) in the case of an assignment, the assignee assumes in writing and agrees to keep and perform all of the terms of this Lease on the part of Tenant to be kept and performed and becomes jointly and severally liable with Tenant for the performance thereof, (y) an original counterpart of each such sublease and assignment and assumption, duly executed by Tenant and such sublessee or assignee, as the case may be, in form and substance satisfactory to Landlord, is delivered promptly to Landlord, and (z) in case of either an assignment or subletting, Tenant remains primarily liable, as principal rather than as surety, for the prompt payment of Rent and for the performance and observance of all covenants and agreements to be performed by Tenant hereunder. Tenant shall not, without Landlord's approval which Landlord may withhold in its sole and absolute discretion, permit any person other than CMS or its Affiliates, to own at any time more than 50% of Tenant's voting stock or assets.

23.2  Attornment.  Tenant shall insert in each sublease permitted under Section 23.1 provisions satisfactory to Landlord which provide for the benefit of Landlord that (a) such sublease is subject and subordinate to all of the terms and provisions of this Lease and to the rights of Landlord hereunder, (b) in the event this Lease shall terminate before the expiration of such sublease, the sublessee thereunder will, at Landlord's option, either attorn to Landlord and waive any right the sublessee may have to terminate the sublease or surrender possession under such sublease, and (c) in the event the sublessee receives a written Notice from Landlord or Landlord's assignees, if any, stating that Tenant is in default under this Lease, the sublessee shall thereafter be obligated to pay all rentals accruing under said sublease directly to the party giving such Notice, or as such party may otherwise direct.  All rentals received from the sublessee by Landlord or Landlord's assignees, if any, as the case may be, shall be credited against the amounts owed to Landlord under this Lease.

23.3  Sublease Limitation.  Anything contained in this Lease to the contrary notwithstanding, Tenant shall not sublet the Property on any basis such that the rental to be paid by the

-55-

sublessee thereunder would be based, in whole or in part, on
either (a) the income or profits derived by the business activi-
ties of the sublessee, or (b) any other formula such that any
portion of the sublease rental would fail to qualify as "rents
from real property" within the meaning of Section 856(d) of the
Code, or any similar or successor provision thereto.

## ARTICLE XXIV
### INFORMATION FROM TENANT

24.1  **Officer's Certificates.**  At any time and from time to
time, upon not less than 20 days Notice by Landlord, Tenant shall
furnish to Landlord an Officer's Certificate certifying that this
Lease is unmodified and in full force and effect (or that this
Lease is in full force and effect as modified and setting forth
the modifications), the date to which the Rent has been paid,
whether there exists any Event of Default or any situation which,
with the giving of notice, passage of time, or both, would con-
stitute an Event of Default hereunder, whether Tenant contends
that Landlord is in default hereunder, and if Tenant so contends,
the basis for such contention, the date upon which the Term
terminates, and such other information as Landlord reasonably may
request.  Any such certificate furnished pursuant to this Section
24.1 may be relied upon by Landlord, any prospective purchaser of
the Property, and any Facility Mortgagee or Landlord Lender.

24.2  **Financial Information.**  Tenant shall furnish, or cause
CMS to furnish, within the time periods specified with respect
thereto, the following statements to Landlord:

(a)      within 90 day after the end of each Fiscal
Year, an Officer's Certificate stating that, after making due
inquiry, Tenant is not in default in the performance or
observance of any of the terms of this Lease, or if Tenant shall
be in default to its knowledge, specifying all such defaults, the
nature of such defaults, and the steps being taken to remedy the
same;

(b)      with reasonable promptness, such other
information respecting the financial condition and affairs of
Tenant as Landlord may reasonably request from time to time; and

(c)      the most recent quarterly financial statements
of Tenant certified by the chief financial officer of Tenant
within 45 days after each quarter of any Fiscal Year (or, in the
case of the final quarter in any Fiscal Year, within 90 days
thereof).

-56-

24.3 **Licensing Information.** Tenant shall promptly furnish to Landlord complete copies of all surveys, examinations, inspections, compliance certificates and similar reports of any kind issued to Tenant by any governmental agencies or authorities having jurisdiction over the licensing of the operation of the Property which are material to the Property or the Facility, their ownership or operation.

## ARTICLE XXV
## APPRAISALS OF THE PROPERTY AND OPTIONS

25.1 **Appraisers.** If at any time it becomes necessary to determine the Fair Market Value, Fair Market Value Purchase Price or Fair Market Rental of the Property for any purpose under this Lease, and the parties are unable to agree thereupon, the party required or permitted to give Notice of such required determination shall include in the Notice the name of a person selected to act as appraiser on its behalf. Within ten days after such Notice, Landlord or Tenant, as the case may be, shall by Notice to Tenant or Landlord, as the case may be either agree to the appointment of the appraiser identified in such initial Notice, in which case such appraiser shall be the sole appraiser for purposes of determining the Fair Market Value, Fair Market Value Purchase Price or Fair Market Rental, as the case may be, or shall appoint a second person as an appraiser on its behalf. Any appraiser appointed pursuant to this Section must be a member of the American Institute of Real Estate Appraisers (or any successor organization thereto). The appraiser(s) thus appointed shall, within 45 days after the date of the Notice appointing the first appraiser, proceed to appraise the Property to determine the Fair Market Value, Fair Market Value Purchase Price or Fair Market Rental thereof (as the case may be) as of the relevant date (giving effect to the impact, if any, of inflation from the date of their decision to the relevant date). In the case of two appraisers, except as provided in Section 25.2, the two appraisals shall be averaged to determine the Fair Market Value, Fair Market Value Purchase Price or Fair Market Rental, as the case may be. In any event, the appraised value determined in accordance with this Section shall be final and binding on Landlord and Tenant.

25.2 **Method of Appraisal.** Any appraisal required or permitted by the terms of this Lease shall be conducted in a manner consistent with sound appraisal practice. Notwithstanding the provisions of Section 25.1, if the difference between the appraisal amounts determined by the appraisers appointed pursuant to Section 25.1 exceeds ten percent of the lesser of such appraisal amounts, then the two appraisers shall have 20 days to

appoint a third appraiser.  If no such appraiser is appointed within such 20 days or within 90 days of the original request for a determination of Fair Market Value, Fair Market Value Purchase Price or Fair Market Rental (as the case may be), whichever is earlier, either Landlord or Tenant may apply to any court having jurisdiction to have such appointment made by such court.  Any appraiser appointed by the original appraisers or by such court shall be instructed to determine the Fair Market Value, Fair Market Value Purchase Price or Fair Market Rental (as the case may be) within 45 days after the appointment of such appraiser. The determination of the three appraisers which differs most in the terms of dollar amount from the determinations of the other two appraisers shall be excluded, and 50% of the sum of the remaining two determinations shall be the appraised value, which appraised value shall be final and binding upon Landlord and Tenant as the Fair Market Value, Fair Market Value Purchase Price or Fair Market Rental of the Property, as the case may be.  If the lowest and highest appraised values are equidistant in amount from the middle appraised value, then such middle appraised value shall be the Fair Market Value, Fair Market Value Purchase Price or Fair Market Rental (as the case may be).  The provisions of this Article shall be specifically enforceable to the extent such remedy is available under applicable law, and any determination hereunder shall be final and binding upon the parties except as otherwise provided by applicable law.  Landlord and Tenant each shall pay the fees and expenses of the appraiser appointed by it, and each shall pay one-half of the fees and expenses of the third appraiser and one-half of all other costs and expenses incurred in connection with each appraisal.

25.3  Landlord's Option to Purchase Tenant's Personal Property.  Effective upon not less than 90 days' prior Notice given at any time within 180 days prior to the expiration of the Term of this Lease, or upon such shorter Notice as shall be reasonable if this Lease is terminated prior to its expiration date, Landlord shall have the option to purchase all (but not less than all) of Tenant's Personal Property, if any, at the expiration or termination of this Lease, for an amount equal to the then net market value thereof (as determined by an appraisal conducted pursuant to Section 25.2) subject to, and with appropriate price adjustments for, all equipment leases, conditional sale contracts, UCC financing statements and other encumbrances to which Tenant's Personal Property is subject.

25.4  Tenant's Option to Purchase the Property.  Provided no Event of Default has occurred and is continuing, Tenant shall have the option exercisable on not less than six months' nor more than 18 months' Notice to purchase the Property upon the expiration of any Term at the greater of Fair Market Value Purchase Price of the Property as of the expiration of said Term or the

-58-

inimum Repurchase Price.  The foregoing option to purchase is also hereby granted to, and may be exercised during the foregoing 12 month period by, Washington or CMS Fayetteville; provided, however, that if both Washington and one or more of CMS Fayetteville and Tenant attempt to exercise the foregoing option, such option shall vest solely in Washington and neither Tenant nor CMS Fayetteville will have any right of option to purchase the Property pursuant to this Section 25.4; provided, further, that if both Tenant and CMS Fayetteville (but not Washington) attempt to exercise the foregoing option, such option shall vest solely in Tenant and CMS Fayetteville shall have no right or option to purchase the Property pursuant to this Section 25.4.

## ARTICLE XXVI
### FACILITY MORTGAGES

Without the consent of Tenant, Landlord may, subject to the terms and conditions set forth below in this Section, from time to time, directly or indirectly, create or otherwise cause to exist any lien, encumbrance or title retention agreement ("Encumbrance") upon the Property, or any portion thereof or interest therein, whether to secure any borrowing or other means of financing or refinancing provided that the principal amount of such borrowing, financing or refinancing does not exceed 80% of the then Fair Market Value of the Property.  Any such Encumbrance (i) shall contain the right to prepay (whether or not subject to a prepayment penalty) and (ii) shall provide that it is subject to the rights of Tenant under this Lease, including the rights of Tenant to acquire the Property pursuant to the applicable provisions of this Lease, provided, however, that Tenant agrees that it will not unreasonably withhold its consent to any request by Landlord that Tenant subordinate this Lease to any mortgage or deed of trust that may hereafter from time to time be recorded on the Property, and to any and all advances made or to be made thereunder, and to renewals, replacements and extensions thereof. Any such subordination, however, shall be subject to the condi- tion precedent that the mortgagee under such mortgage or the beneficiary under such deed of trust enter into a written non- disturbance and attornment agreement with Tenant, in form and content satisfactory to Tenant, whereunder it is agreed that in the event of a sale or foreclosure under such mortgage or deed of trust, the purchaser of the Property (including the mortgagee or beneficiary under such mortgage or deed of trust), shall acquire or hold the Property subject to this Lease so long as Tenant is not in default hereunder, and so long as Tenant recognizes such purchaser as the landlord under this Lease and agrees, if requested to do so, to attorn to such purchaser and, if instructed to do so by such purchaser, to make rental payments

directly to it; provided, however, that this Lease is and shall at all times be and remain subject and subordinate to the lien and to the terms and conditions of that certain First Acquisition and Construction Mortgage, Assignment of Rents and Security Agreement of even date herewith, by and among Landlord, as Mortgagor, and American Health Properties, Inc., a Delaware corporation, as Mortgagee, and all other documents executed in connection therewith.

## ARTICLE XXVII
### LIMITATION OF LIABILITY

Tenant specifically agrees that no officer, shareholder, employee or agent of AHP of Fayetteville, Inc. shall be held to any personal liability, jointly or severally, for any obligation of, or claims against Landlord, Tenant agreeing to look solely to Landlord's equity interest in the Property for recovery of any judgment from Landlord. The provisions contained in the fore-going sentence are not intended to, and shall not, limit any right that Tenant might otherwise have to obtain injunctive relief against Landlord or Landlord's successors in interest, or any action not involving the personal liability of Landlord (original or successor). In no event shall Landlord (original or successor) or any Affiliate of Landlord be required to respond in monetary damages from Landlord's assets other than Landlord's equity interest in the Property. Furthermore, except as other-wise expressly provided herein, in no event shall Landlord or any Affiliate of Landlord (original or successor) ever be liable to Tenant for any indirect or consequential damages suffered by Lessee from whatever cause.

## ARTICLE XXVIII
### MISCELLANEOUS

28.1  Landlord's Right to Inspect. Landlord and its author-ized representatives may, at any time and from time to time, upon reasonable notice to Tenant, inspect the Property during usual business hours subject to any security, health, safety or patient business confidentiality requirements of Tenant or any govern-mental agency, or created by any Insurance Requirement or Legal Requirement relating to the Property.

28.2  No Waiver. No failure by Landlord or Tenant to insist upon the strict performance of any term hereof or to exercise any right, power or remedy provided hereunder, and no acceptance of full or partial payment of Rent during the continuance of any such breach, shall constitute a waiver of any such breach or of

any such term.  To the extent permitted by applicable law, no waiver of any breach shall affect or alter this Lease, which shall continue in full force and effect with respect to any other then existing or subsequent breach.

28.3  **Remedies Cumulative.**  To the extent permitted by law, each legal, equitable or contractual right, power and remedy of Landlord or Tenant now or hereafter provided either in this Lease or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power and remedy.  The exercise or beginning of the exercise by Landlord or Tenant of any one or more of such rights, powers and remedies shall not preclude the simultaneous or subsequent exercise by Landlord or Tenant of any or all of such other rights, powers and remedies.

28.4  **Acceptance of Surrender.**  No surrender to Landlord of this Lease or of all or any portion of or interest in the Property shall be valid or effective unless agreed to and accepted in writing by Landlord, and no act by Landlord or any representative or agent of Landlord, other than such a written acceptance by Landlord, shall constitute an acceptance of any such surrender by Tenant.

28.5  **No Merger of Title.**  There shall be no merger of this Lease or of the leasehold estate created hereby if the same person, firm, corporation or other entity acquires, owns or holds, directly or indirectly, this Lease or the leasehold estate created hereby or any interest in this Lease or such leasehold estate, and the fee estate in the Property.

28.6  **Conveyance by Landlord.**  If Landlord or any successor owner of the Property conveys the Property in accordance with the terms hereof (other than as security for a debt), and the grantee or transferee of the Property expressly assumes all obligations of Landlord hereunder arising or accruing from and after the date of such conveyance or transfer, Landlord or such successor owner, as the case may be, thereupon shall be released from all liabilities and obligations of Landlord under this Lease.

28.7  **Quiet Enjoyment.**  So long as Tenant pays all Rent as the same becomes due and fully complies with all of the terms of this Lease and fully performs its obligations hereunder, Tenant shall peaceably and quietly have, hold and enjoy the Property for the Term hereof, free of any claim or other action by Landlord or anyone claiming by, through or under Landlord, but subject to all liens and encumbrances of record as of the date hereof or hereafter consented to by Tenant.  Except as otherwise provided in this Lease, no failure by Landlord to comply with the foregoing covenant shall give Tenant any right to cancel or terminate this Lease or abate, reduce or make a deduction from or offset against

the Rent or any other sum payable under this Lease, or to fail or refuse to perform any other obligation of Tenant hereunder. Notwithstanding the foregoing, Tenant shall have the right, by separate and independent action, to pursue any claim it may have against Landlord as a result of a breach by Landlord of the covenant of quiet enjoyment contained in this Section.

28.8 **Notices.** All notices, demands, requests, consents, approvals and other communications ("Notice" or "Notices") hereunder shall be in writing and delivered by personal delivery, courier or messenger service, express or overnight mail, or by registered or certified mail, return receipt requested and postage prepaid, addressed to the respective parties as follows:

If to Tenant:

Continental Medical Systems, Inc.
600 Wilson Lane
P.O. Box 715
Mechanicsburg, PA  17055
Attention:  Vice President of
Legal Affairs

and a copy to:

Drinker, Biddle & Reath
1100 Philadelphia National Bank Building
Broad & Chestnut Streets
Philadelphia, PA  19107
Attention:  Ralph Rodak, Esq.

If to Landlord:

Fayetteville Health Associates
     Limited Partnership
c/o American Health Properties, Inc.
11150 Santa Monica Blvd., Ste. 800
Los Angeles, California 90025
Attention:  President

and a copy to:

Ervin, Cohen & Jessup
9401 Wilshire Blvd., Ninth Floor
Beverly Hills, CA  90212
Attention:  James A. Rice, Esq.

or to such other address as either party may hereafter designate. Personally delivered Notices sent by courier or messenger service or by express or overnight mail shall be effective upon receipt, and Notices given by mail shall be complete at the time of deposit in the U.S. mail system, but any prescribed period of Notice and any right or duty to do any act or make any response within any prescribed period or on a date certain after the service of such Notice given by mail shall be extended five (5) days.

28.9  **Survival of Terms; Applicable Law.**  Anything contained in this Lease to the contrary notwithstanding, all claims against, and liabilities of, Tenant or Landlord arising prior to any date of termination of this Lease shall survive such termination for two years, except for third party claims based on alleged tortious actions and omissions of Tenant during the term of this Lease, which third party claims shall survive the term of this Lease.  If any term or provision of this Lease or any application thereof shall be invalid or unenforceable for any reason whatsoever, the remainder of this Lease and any other application of such term or provisions shall not be affected thereby.  If any late charge or any interest rate provided for in any provision of this Lease based upon a rate in excess of the maximum rate permitted by applicable law, such charges shall be fixed at the maximum permissible rate.  Neither this Lease nor any provision hereof may be changed, waived, discharged, modified or terminated except by an instrument in writing and in recordable form, signed by Landlord and Tenant.  Subject to any limitations on assignment contained in this Lease, all the terms and provisions of this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  The headings in this Lease are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.  THIS LEASE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ARKANSAS, BUT WITHOUT REGARD TO ITS CONFLICTS OF LAWS RULES.

28.10  **Exculpation of Landlord's Officers and Agents.**  This Lease is made on behalf of Landlord by an officer of the general partner, not individually, but solely in his capacity in such office as authorized by the directors of such general partner pursuant to its by-laws.  The obligations of this Lease are not binding upon, nor shall resort be had to, the private property of any of the directors, shareholders, officers, employees or agents of Landlord's general partner or Landlord personally, but bind only Landlord's property.  The provision contained in the foregoing sentence is not intended to, and shall not, limit any right that Tenant might otherwise have to obtain injunctive relief against Landlord or Landlord's successors in interest, or any action not involving the personal liability of the directors, shareholders, officers, employees or agents of Landlord's general partner.  Except as otherwise expressly provided herein, in no event shall Landlord ever be liable to Tenant for any indirect or consequential damages suffered by Tenant from whatever cause.

28.11  **Transfers Following Termination.**  Upon the expiration or earlier termination of the Term, Tenant shall use good faith efforts to transfer to Landlord or Landlord's nominee, or to cooperate with Landlord or Landlord's nominee in connection with the processing by Landlord or Landlord's nominee of any applica-

tions for, all licenses, operating permits and other governmental authorizations and all contracts (including contracts with governmental or quasi-governmental entities) which may be necessary for the operation of the Facility; provided, however, that the costs and expenses of any such transfer or the processing of any such application shall be paid by Landlord or Landlord's nominee.

28.12 Tenant's Waivers.  Tenant waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance and waives all notices of the existence, creation, or incurring of new or additional obligations, except as expressly granted herein.

28.13 Memorandum of Lease.  Landlord and Tenant shall, promptly upon the request of either party, enter into a short form memorandum of this Lease and all options contained herein, in form suitable for recording under the laws of the State in which the Property is located.  Tenant shall pay all costs and expenses of recording such memorandum of this Lease.

28.14 Arbitration.  Any controversy of $10,000 or less (exclusive of interest and costs) arising out of, connected with or incidental to this Agreement shall be decided by arbitration under the Expedited Procedures of the American Arbitration Association, at Los Angeles, California, provided that claim is made within the applicable period of limitation. Depositions to obtain discovery may be taken upon good cause, upon leave to do so granted by the arbitrator.  If either party hereto alleges in a court action that such controversy exceeds $10,000, such party shall be deemed to have waived the right to interest and costs in any award obtained therein if such award does not exceed $10,000.

28.15 Modifications.  No provision of this Lease may be amended, supplemented or otherwise modified except by an agreement in writing signed by the parties hereto or their respective successors in interest.

28.16 Attorneys' Fees.  If either party commences an action against the other to interpret or enforce any of the terms of this Lease or because of the breach by the other party of any of the terms hereof, the losing or defaulting party shall pay to the prevailing party reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution or defense of such

action, whether or not the action is prosecuted to a final judg-
ment.

IN WITNESS WHEREOF, Landlord and Tenant have executed this
Lease as of the date first above written.

"Landlord"

FAYETTEVILLE HEALTH ASSOCIATES
LIMITED PARTNERSHIP, a Delaware
limited partnership

By:  AHP of Fayetteville, Inc., an
     Arkansas corporation,
     its sole general partner

By: _____
        Robert L. B. Diener, President

"Tenant"

NORTHWEST ARKANSAS REHABILITATION
ASSOCIATES, an Arkansas general partnership.

By:  CMS FAYETTEVILLE REHABILITATION, INC., a
     Delaware corporation, its managing
     general partner and its authorized
     representative

By: _____
        Name: KEVIN L KRAUSE
        Title: VICE PRESIDENT

-65-

## GUARANTY

The undersigned hereby requests the Landlord to enter into the foregoing Lease and as an inducement to the Landlord to do so, and additional consideration therefor, the undersigned hereby (a) guarantees unconditionally to Landlord the full, faithful and punctual performance, fulfillment and observance of all of the obligations and liabilities of the Tenant under said Lease; (b) waives notice of and consents to any and all amendments, extension, and renewals of said Lease, any and all assignments, subleases and other action that may be permitted thereunder by the Tenant or Landlord, any and all other amendments, extensions and renewals, any and all advances, extensions, settlement, compromises, favors and indulgences, any and all receipts, substitutions, additions and releases of persons primarily or secondarily liable, and any and all acceptances by the Landlord of negotiable instruments, commercial paper and other property, and agrees that none of the foregoing, should there be any, shall discharge or affect in any way the liability of undersigned hereunder (c) agrees that all rights and remedies of the Landlord under Lease and hereunder shall survive any discharge, moratorium or other relief granted any person primarily or secondarily liable in any proceeding under federal or state law relating to bankruptcy, insolvency or the relief or rehabilitation of debtors, and any consent by the Landlord to, or participation by the Landlord in the proceeds of, any assignment, trust or mortgage for the benefit of creditors, or any composition or arrangement of debts, may be made without the undersigned being discharged or affected in any way thereby; (d) waives any right to require marshalling or exhaustion of any right or remedy against any person, collateral or other property; and (e) waives presentment, demand, protest and notice of default, non-payment and protest of all demands, notices and suretyship defenses generally.

WITNESS the execution hereof under seal as of the 28th day of March, 1990.

CONTINENTAL MEDICAL SYSTEMS, INC.,
a Delaware corporation

By _____
Kevin L. Krause, Vice President

-66-

(20)

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE is executed as of June 28, 1991, by and between FAYETTEVILLE HEALTH ASSOCIATES LIMITED PARTNERSHIP, a Delaware limited partnership, as Landlord, and NORTHWEST ARKANSAS REHABILITATION ASSOCIATES, an Arkansas general partnership, as Tenant, with reference to the following facts:

A.    Landlord and Tenant have entered into the Lease and Security Agreement dated as of March 28, 1990 (the "Lease"), pursuant to which Tenant has leased the Property (as defined in the Lease) from Landlord.  Capitalized terms used and not otherwise defined herein shall have the meanings given to them in the Lease.

B.    The parties now wish to amend the Lease in the manner hereinafter set forth.

NOW, THEREFORE, the Lease is hereby amended as follows:

1.    The definition of "Base Rent" contained in Article I of the Lease is hereby replaced by the following definition:

"'Base Rent' shall mean the sum of $1,051,639, payable in equal monthly installments of $87,636.58."

2.    The definition of "Commencement Date" contained in Article I of the Lease is hereby replaced by the following definition:

"'Commencement Date' shall mean July 1, 1991."

3.    Section 3.1 of the Lease is hereby replaced by the following section:

"3.1  Term of Lease.  The initial term of this Lease shall commence on the Commencement Date and, unless extended or terminated earlier in accordance with the provisions hereof, shall remain in effect for ten years thereafter (the 'Fixed Term')."

4.    Section 4.1 of the Lease is hereby replaced by the following section:

"4.1  Payment of Initial Rent.  On the Commencement Date Tenant shall pay to Landlord, as Initial Rent, the sum of $331,000 in lawful money of the United States of

2

America, in immediately available funds, without right of offset."

5.   A new paragraph is hereby added to Section 17.1 of the Lease, at the end thereof, as follows:

"Notwithstanding anything contained in this Lease to the contrary, it shall be an immediate Event of Default hereunder if, by August 31, 1991, Tenant shall fail to deliver to Landlord either (i) evidence of the issuance to Tenant of a license to operate the Hospital issued by the Arkansas State Board of Health and (ii) the endorsement of Lawyers' Title Insurance Corporation to Owner's Policy No. 85-01-266770 insuring against any loss in the event that the existing improvements on the Property encroach upon any easement, boundary line, building set back line or other restricted area, and against any loss in the event that such improvements constitute a violation of any covenants, conditions and restrictions."

6.   Except as herein amended, the Lease is hereby declared to be in full force and effect, without modification.

7.   This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

3

IN WITNESS WHEREOF, Landlord and Tenant have
executed this First Amendment as of the date first above
written.

> FAYETTEVILLE HEALTH ASSOCIATES
> LIMITED PARTNERSHIP, a Delaware
> limited partnership
>
> By:  AHP OF FAYETTEVILLE, INC., an
>      Arkansas corporation, its sole
>      General Partner
>
> By: _____
>         Vice President
>
>
> NORTHWEST ARKANSAS REHABILITATION
> ASSOCIATES, an Arkansas general
> partnership
>
> By:  CMS FAYETTEVILLE
>      REHABILITATION, INC., a
>      Delaware corporation, its
>      managing general partner and
>      authorized representative,
>
> By:_____
>     Vice President

1E106711

3

IN WITNESS WHEREOF, Landlord and Tenant have
executed this First Amendment as of the date first above
written.

FAYETTEVILLE HEALTH ASSOCIATES
LIMITED PARTNERSHIP, a Delaware
limited partnership

By: AHP OF FAYETTEVILLE, INC., an
Arkansas corporation, its sole
General Partner

By: _____
Vice President

NORTHWEST ARKANSAS REHABILITATION
ASSOCIATES, an Arkansas general
partnership

By: CMS FAYETTEVILLE
REHABILITATION, INC., a
Delaware corporation, its
managing general partner and
authorized representative,

By: _____
Vice President

13106751

1/03/92   12:53   ☎717 766 5342         CMS FINANCE       →→→ NW ARKANSAS      ☎005/007

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE is executed as of December 15, 1991, by and between FAYETTEVILLE HEALTH ASSOCIATES LIMITED PARTNERSHIP, a Delaware limited partnership, as Landlord, and NORTHWEST ARKANSAS REHABILITATION ASSOCIATES, an Arkansas general partnership, as Tenant, with reference to the following facts:

A.    Landlord and Tenant have entered into the Lease and Security Agreement dated as of March 28, 1990, as amended by the First Amendment to Lease dated as of June 28, 1991 (the "Lease"), pursuant to which Tenant has leased the Property (as defined in the Lease) from Landlord.

B.    The parties now wish to amend the Lease in the manner hereinafter set forth.

NOW, THEREFORE, Landlord and Tenant hereby agree as follows:

1.    Section 4.5 of the Lease is hereby replaced by the following section:

"4.5 Additional Rent.  'Additional Rent' shall be due and payable quarterly to Landlord, initially, on November 14, 1991, and, subsequently, on the 45th day after the last day of every calendar quarter commencing during the Term in an amount equal to .7% of the annualized amount of Gross Revenues for the calendar quarter most recently completed, other than Gross Revenues attributable to Medicare and Medicaid patients."

2.    Except as herein amended, the Lease is hereby declared to be in full force and effect, without modification.

3.    This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

///

///

///

///

2

IN WITNESS WHEREOF, Landlord and Tenant have executed this Second Amendment to Lease as of the date first above written.

FAYETTEVILLE HEALTH ASSOCIATES
LIMITED PARTNERSHIP, a Delaware
limited partnership

By:  AHP OF FAYETTEVILLE, INC., an
Arkansas corporation, its sole
General Partner

By:_____
Vice President


NORTHWEST ARKANSAS REHABILITATION
ASSOCIATES, an Arkansas general
partnership

BY:  CMS FAYETTEVILLE REHABILITATION,
INC., a Delaware corporation,
its managing general partner
and authorized representative

By: _____
Vice President

1E125902

# THIRD AMENDMENT TO
## LEASE AND SECURITY AGREEMENT

**THIS THIRD AMENDMENT** ("Amendment") to Lease and Security Agreement is made and entered into as of the 31st day of December, 1994, by and between FAYETTEVILLE HEALTH ASSOCIATES LIMITED PARTNERSHIP, a Delaware limited partnership ("Landlord"), and NORTHWEST ARKANSAS REHABILITATION ASSOCIATES, an Arkansas general partnership ("Tenant").

## BACKGROUND:

A.     Landlord and Tenant are parties to that certain Lease and Security Agreement dated as of March 28, 1990, as amended pursuant to that certain First Amendment to Lease Agreement dated as of June 28, 1991, and that certain Second Amendment to Lease dated as of December 16, 1991 (collectively, the "Lease") (all capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Lease).

B.     Landlord and Tenant desire to amend the Lease as hereinafter set forth.

NOW, THEREFORE, for and in consideration of the mutual covenants and conditions herein contained, and intending to be legally bound hereby, Landlord and Tenant hereby agree as follows:

1.     The following provision is hereby added to the end of Section 4.5 of the Lease:

"Notwithstanding the foregoing, (i) a one-time additional installment of Additional Rent in the amount of Two Hundred Eighty Eight Thousand Nine Hundred Thirty Three Dollars ($288,933) shall be due and payable on or before December 31, 1994 (the "Lump-Sum Payment"), and Landlord hereby directs Tenant to make such Lump-Sum Payment directly to Landlord's Class B Limited Partner (as such term is defined in Landlord's partnership agreement), and (ii) from and after January 1, 1995, the "Additional Rent" due and payable under this Lease shall be equal to Three Thousand Five Hundred Twenty Five Dollars ($3,525) a year, and shall be payable in equal quarterly installments of Eight Hundred Eighty One and 25/100 Dollars ($881.25), which shall be due on or before the 45th day after the last day of each calendar quarter. The first installment of Additional Rent, fixed on January 1, 1995 as aforesaid, shall therefore be due and payable on or before May 15, 1995."

2.     The effective date of this Amendment shall be December 31, 1994.

3.     All other terms and conditions of the Lease not modified hereby shall remain in full force and effect.

4.     This Amendment may be executed in one or more counterparts, each of which

shall be considered an original and, when taken together, shall constitute one and the same instrument.

5.    This Amendment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Landlord and Tenant have caused this instrument to be duly executed as of the day and year first above written.

"LANDLORD"

FAYETTEVILLE HEALTH ASSOCIATES LIMITED PARTNERSHIP, a Delaware limited partnership

By:    AHP OF FAYETTEVILLE, INC.,
       an Arkansas corporation.

By: _____
     Name: Geoffrey D. Lewis
     Title: Vice President

"TENANT"

NORTHWEST ARKANSAS REHABILITATION ASSOCIATES, an Arkansas general partnership

By:    CMS FAYETTEVILLE REHABILITATION, INC.,
       a Delaware corporation, its Managing General Partner and authorized representative

By: _____
     Deborah Myers Welsh,
     Vice President

2

*Received from*
*faculty 7/11/2006*
[Fayetteville, AR]

## FOURTH AMENDMENT TO LEASE

THIS FOURTH AMENDMENT TO LEASE (the "Amendment") is made and entered into as of this 22nd day of May, 2001, by and between FAYETTEVILLE HEALTH ASSOCIATES LIMITED PARTNERSHIP, a Delaware limited partnership ("Landlord"), and NORTHWEST ARKANSAS REHABILITATION ASSOCIATES, an Arkansas general partnership ("Tenant") with respect to the following:

### RECITALS

A.      Landlord is the owner of certain Land, Improvements and Fixtures and related rights thereto comprising a 60-bed comprehensive medical rehabilitation hospital commonly known as "Fayetteville Rehabilitation Hospital" located in Fayetteville, Arkansas, and more particularly described and defined in the Lease (hereinafter defined) (collectively, the "Leased Property").

B.      Landlord Tenant is are parties to that certain written Lease and Security Agreement dated as of March 28, 1990 (the "Original Lease") between Landlord, as "Landlord", and Tenant, as "Tenant", covering the Leased Property, as the Original Lease has been amended and modified by (i) that certain First Amendment to Lease dated as of June 28, 1991, (ii) that certain Second Amendment to Lease dated as of December 15, 1991, and (iii) that certain Third Amendment to Lease and Security Agreement dated as of December 31, 1994 (the Original Lease, as so amended and modified by the foregoing three agreements being hereinafter collectively referred to as the "Lease").

C.      The Fixed Term of the Lease will expire, by its own terms, on June 30, 2001 (the "Current Expiration Date").

D.      Tenant desires to exercise its first and second options to extend the Lease for an Extended Term of five (5) years as provided in Section 3.2 of the Lease, for a total extension of ten (10) years, and Tenant and Landlord desire to amend the Lease in certain other particulars, but only upon the terms and conditions set forth in this Amendment.

E.      Capitalized terms used herein and not otherwise defined shall have the meaning assigned to those terms in the Lease.

### AMENDMENT

IN CONSIDERATION OF the foregoing recitals and the mutual promises and covenants contained herein, Landlord and Tenant agree as follows:

1      Effective Date. The Effective Date of this Amendment shall be immediately following the Current Expiration Date (such date being July 1, 2001, the "Effective Date"), notwithstanding any earlier or later execution and delivery hereof by the parties hereto.

2    Extension of Term.  By their signatures hereto, Landlord and Tenant hereby agree that Term of the Lease be extended for the period from the Effective Date through and including June 30, 2011 (the "Extended Term"), unless sooner terminated as provided in the Lease, as hereby amended.

3    Terms of Leasing for the Extended Term.  The Extended Term shall be upon all of the terms and conditions of the Lease, as hereby amended, except as follows:

(a)    The Extended Term shall commence immediately upon the Effective Date.

(b)    Tenant shall pay Minimum Rent for the Extended Term in accordance with the provisions of paragraphs 4 and 5 below.

(c)    Those provisions of the Lease which are inconsistent with or superseded by the provisions of this Amendment shall have no application with respect to the Extended Term.

(d)    All amendments and modifications to the Lease contained in this Amendment shall apply with respect to the Extended Term.

(e)    As used in the Lease and this Amendment, the word "Term" or the phrase "Term of this Lease" shall mean and include the Fixed Term, the Extended Term provided for in paragraph 2 above, and the additional Extended Terms, if any, provided for in Section 3.2 of the Lease, as the context may require, unless the Lease is earlier terminated pursuant to the provisions thereof.

4    Base Rent.  During the Extended Term, Tenant will pay to Landlord in lawful money of the United States of America which shall be legal tender for the payment of public and private debts, without offset or deduction, the amounts set forth in or determined pursuant to this paragraph 4 as monthly "Base Rent."  Payments of monthly Base Rent shall be paid in advance on or before the first (1st) day of each calendar month (provided that if this Amendment is executed after the Effective Date, any monthly Base Rent due pursuant to the terms hereof from the Effective Date through the last day of the calendar month in which this Amendment is executed, to the extent unpaid, shall be paid to Landlord concurrently with the execution of this Amendment) and shall be made either via wire transfer to an account as Landlord may from time to time designate in writing or by delivery of Tenant's check therefor by U.S. Mail or other reputable courier service.

(a)    Commencing on the Effective Date and continuing through the expiration of the first (1st) Lease Year (as hereinafter defined) of the Extended Term, Tenant shall pay to Landlord one-twelfth (1/12) of the annual "Base Rent" of $1,450,000, or a monthly Base Rent in the sum of $120,833.33.

(b)    Commencing upon the commencement of the second (2nd) Lease Year of the Extended Term (i.e., July 1, 2002) and continuing upon the commencement of each

@ 122,261.30   7/1/2002 - 6/30/2003   ↑ 1.1%
# 124,977.24   7/1/2003 - 6/30/2004   ↑ 2.0%
@ 128,512.56   as of 7/1/2004         ↑ 2.9%

Lease Year thereafter through and including the commencement of the tenth (10th) Lease Year of the Extended Term (i.e., July 1, 2010), the annual Base Rent as was in effect for the immediately prior Lease Year shall be increased for the then current Lease Year by the percentage increase, if any, in the Cost of Living Index (as hereinafter defined) published for the month that is two months preceding the commencement of the applicable Lease Year over the applicable "base"; provided, however, that in no event shall the annual Base Rent after any such adjustment pursuant to this subparagraph (b) be less than One Hundred Percent (100%) nor more than One Hundred Three Percent (103%) of the annual Base Rent in effect immediately prior to such adjustment, notwithstanding the actual percentage change in the applicable Cost of Living Index; and the monthly Base Rent for such Lease Year shall be one-twelfth (1/12) of the annual Base Rent resulting from such increase. The Cost of Living Index published for the month that is two months prior to the Effective Date shall be considered the initial "base," and each comparison Cost of Living Index used pursuant to this paragraph shall thereafter be the new "base" for the next succeeding adjustment pursuant to this subparagraph (b).

(c) If any increase in annual Base Rent provided for in subparagraph (b) shall not have been made at the commencement of the Lease Year for which applicable, Tenant shall continue to pay monthly Base Rent at the last rate applicable until Tenant receives Landlord's written notice as to such adjustment. Within ten (10) days after Tenant's receipt of Landlord's notice, Tenant shall pay to Landlord an amount equal to the new monthly Base Rent times the number of months from the commencement of the then current Lease Year to the date of receipt of Landlord's notice, less the aggregate amount paid by Tenant on account of monthly Base Rent for the same period. Thereafter, Tenant shall pay monthly Base Rent for the applicable Lease Year at the new rate set forth in Landlord's notice.

5. Other Amendments and Modifications to the Lease. Effective as of the Effective Date, the Lease shall be amended and supplemented in the following particulars:

(a) Deleted Definitions. The following definitions appearing in Article I of the Lease (prior to this Amendment) shall be deleted and all references thereto in the Lease shall have no further force or effect: "Additional Rent" and "Percentage Rent".

(b) New Definitions. The following definitions shall be added to Article I of the Lease:

"BLS: Bureau of Labor Statistics, U.S. Department of Labor."

"Cost of Living Index: The Consumer Price Index for All Urban Consumers, U.S. City Average (1982-1984 = 100), published by the BLS, or such other renamed index. If the BLS changes the publication frequency of the Cost of Living Index so that a Cost of Living Index is not available to make a cost-of-living adjustment as specified herein, the cost-of-living adjustment shall be based on the percentage difference between the Cost of Living Index for the closest preceding month for which a Cost of Living Index is available and the Cost of Living Index for the comparison month as required by this Lease. If the BLS changes the base reference period for the Cost of Living Index from 1982-84 = 100, the cost-of-living adjustment

3

shall be determined with the use of such conversion formula or table as may be published by the BLS. If the BLS otherwise substantially revises, or ceases publication of the Cost of Living Index, then a substitute index for determining cost-of-living adjustments, issued by the BLS or by a reliable governmental or other nonpartisan publication, shall be reasonably selected by Landlord."

"Lease Year: Each period of twelve (12) full calendar months from and after the Effective Date; provided, however, that the last Lease Year during the Extended Term may be a period of less than twelve (12) full calendar months and shall end on the last day of the Extended Term."

(c)     Deleted Provisions. The following sections of the Lease shall be deleted and all references thereto in the Lease shall have no further force or effect: Sections 4.4 [Percentage Rent], 4.5 [Additional Rent], 4.6 [Confirmation of Percentage Rent] and 4.7 [Certificates Regarding Percentage Rent].

6     Miscellaneous.

(a)     Landlord Representations. Landlord hereby represents and warrants to Tenant that as of the date hereof: (i) Landlord owns the Leased Property, (ii) Landlord has full power and authority to enter into this Amendment, (iii) no other Person has the right to lease or occupy the Leased Premises other than Tenant and those Persons who claim by, through or under Tenant and (iv) no other Person has the right to purchase or acquire all or any part of the Leased Property except for the right expressly granted to Tenant pursuant to the Lease.

(b)     Lease In Effect. Landlord and Tenant acknowledge and agree that the Lease, as hereby amended and supplemented, remains in full force and effect in accordance with its terms.

(c)     Counterparts. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute a single instrument. Delivery of an executed counterpart of a signature page to this Amendment via telephone facsimile transmission shall be as effective as delivery of a manually executed counterpart of this Amendment.

(d)     Severability. If any term, provision, condition or covenant of this Amendment or its application to any party or circumstance shall be held, to any extent, invalid or unenforceable, the reminder of this Amendment, or the application of the term, provisions, condition or covenant to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected, and shall be valid and enforceable to the fullest extent permitted by law.

[Signature Page Follows]

4

IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment as of the day first written above.

"TENANT"

NORTHWEST ARKANSAS
REHABILITATION ASSOCIATES, an
Arkansas general partnership

By:  CMS Fayetteville Rehabilitation, Inc.

Its:  Managing General Partner and Authorized
Representative

By: _____

Title: _SENIOR  VP_____

"LANDLORD"

FAYETTEVILLE HEALTH ASSOCIATES
LIMITED PARTNERSHIP, a Delaware limited
partnership

By:    Health Care Property Investors, Inc., a
Maryland corporation

Title:    General Partner

By: _____
         Arthur G. Sundby
Title: _____Vice President_____

5