**Opinion of R. Steven Hamner**

In the United States District Court
For the Western District of Arkansas
Fayetteville Division

**Washington Regional Outreach Services (WROS)**
vs.
**MPT of Fayetteville, LLC (the Landlord)**

Case No. 2011-5030

**Introduction**

I, Richard Steven Hamner, hereby present my opinions regarding the valuation of the real estate of the HealthSouth Rehabilitation Hospital (the Property) that is the subject of the above referenced litigation.

**Professional Background**

I am Executive Vice President and Chief Financial Officer, a director and a founder of Medical Properties Trust, Inc. (MPT) the indirect 100 percent owner of the Landlord. MPT is a publicly traded real estate investment trust (NYSE:MPW) and is the largest investor in licensed hospital real estate in the country with assets exceeding $2.1 billion. I have been MPT's CFO since its founding in 2003 and have been directly responsible for the valuation, negotiation, documentation, funding and accounting for more than 100 separate hospital transactions valued at more than $2.5 billion. These transactions have been for investments as small as $6.0 million and as large as $90.0 million for a single facility. The majority of these transactions have been acquisitions, although I have also been responsible for the sales of hospital real estate of approximately 13 facilities aggregating approximately $400 million. My expertise, therefore, is based on participation on both sides of transactions: as buyer and as seller.

Opinion of R. Steven Hamner
Case No. 2011-5030
Page 7

term or even whether there is an existing lease. For example, when MPT bought the Property in June 2008 for $19,452,000, it understood that the lessee had the right to vacate the facility in June 2011. However, my opinion was that, for all of the reasons discussed above, it was likely that the lessee would elect to remain in the facility beyond the 2011 lease expiration (and the seller negotiated the final price based on its projected income from a similarly-termed lease). This assessment was proved accurate as evidenced by the December 2010 stated desire and intent of WROS and the lessee to remain in the Property. This prediction at the time of MPT's 2008 acquisition was simply the exercise of reasonable judgment by knowledgeable participants in the hospital real estate market. Based on the ultimate outcomes to date, it is my opinion that all four parties (MPT, the seller, WROS and the lessee) separately reached similar conclusions concerning the length of time that an operator would remain in the Project – in 2008, MPT and the seller predicted that the lessee would want to remain in this particular facility beyond the lease expiration, and in 2010, WROS and the lessee validated this prediction by expressing their desires to remain there.

*The Amount of Lease Payments*

When a buyer invests in a hospital facility that is currently subject to a lease agreement, the amount of lease payments that the buyer will collect during each year of the lease is typically fixed, determinable and contractual. For example, when MPT bought the Property in June 2008 for $19,452,000, the lessee was obligated to pay approximately $1,717,134 annually with periodic contractual escalations. Although it was evident to MPT that the lessee was not obligated to maintain occupancy and payments beyond June of 2011, it was my opinion that rental payments of similar amounts would continue to be paid by the lessee if the lease was

1021498.1

Opinion of R. Steven Hamner
Case No. 2011-5030
Page 8

extended or by a replacement lessee if the existing lessee vacated. My opinion was based in part on the fact that the lessee had only two years earlier, in June 2006, concluded that the current rent reflected fair rental value by extending the lease term for an additional five years at approximately that $1.7 million annual lease rate. In October 2010, my opinion that the contractual lease payment of approximately $1.7 million reflected market expectations for the foreseeable future was confirmed by WROS. Based on October 18, 2010 internal emails between WROS executives Tom Olmstead and Dan Eckels (see WROS production at Bates PDiscovery 00815/816), WROS elected to exercise its option to purchase the real estate from MPT only after they discussed the likelihood that a new lease in 2011 would generate annual lease payments of $1,727,288, a rental rate substantially identical to the $1,762,176 market rate then being paid by the lessee.

*Costs Incurred by the Landlord*

The substantial majority of hospital leases are written as "net leases." These agreements provide that the lessee must pay for all costs of the real estate, including maintenance, taxes, insurance, and capital improvements. Accordingly, the step taken in the income approach to calculate the present value of the landlord's cash outflows is not required for the evaluation of net leased real estate because such leases contemplate that there will be no such outflows.

*Required Rate of Return*

The fourth element of the valuation calculation is the rate of return that a buyer requires as compensation for the use of its resources (the purchase price). There are several components of this rate, the largest of which is the buyer's cost of the capital used to fund the purchase price. This is unique to each buyer and is affected by the source and amount of the capital (public

1021498.1